**DAVID W. LARSEN** and **SHIRLEY LARSEN**, Plaintiffs–Appellees, Cross–Appellants, v. **PACE-SETTER SYSTEMS, INC.**, a California Corporation, Defendant–Appellant, Cross–Appellee, and **SIEMENS–PACESETTER, INC.**, a California Corporation, Defendant

NO. 15106

(CIV. NO. 87–3740)

SEPTEMBER 30, 1992

LUM, C.J., WAKATSUKI,* MOON, AND LEVINSON, JJ., AND INTERMEDIATE COURT OF APPEALS CHIEF JUDGE BURNS, IN PLACE OF KLEIN, J., RECUSED

---

*Associate Justice Wakatsuki, who heard oral argument in this case, passed away on September 22, 1992. *See* HRS § 602–10 (1985).

4

OPINION OF THE COURT BY LUM, C.J.

This is an appeal and cross–appeal from a jury verdict in favor of plaintiffs David W. Larsen and Shirley Larsen on their breach of implied warranty claim against defendant Pacesetter Systems, Inc. (Pacesetter). Mr. Larsen was implanted with a Programalith III Series Model 241–6 pacemaker, one of a group of devices later recalled because of their potential to malfunction at temperatures slightly above normal body temperature. The jury awarded Mr. Larsen damages for injuries resulting from the removal and replacement of the device, and awarded Mrs. Larsen damages for emotional distress and loss of consortium. Pacesetter's primary contention on appeal is

that there was no basis for liability since the pacemaker removed from Mr. Larsen did not malfunction and was not defective. Pacesetter also maintains that the action should have been dismissed because pacemakers are unavoidably unsafe products within the meaning of comment k to Restatement (Second) of Torts § 402A. Pacesetter's other claims on appeal include the assertion that the suit was precluded by the statute of limitations for personal injury actions and preempted by Federal law. In addition, Pacesetter argues that the trial court should not have excluded evidence of its limited warranty, the jury should have been instructed on the defense of assumption of the risk, Mr. Larsen produced insufficient evidence of his future pain and suffering to allow instruction on these damages, Mrs. Larsen was not entitled to recover mental distress damages in an implied warranty action, and the court exceeded statutory limits when it imposed postjudgment interest on prejudgment interest.

Of the issues raised by the Larsens in their cross–appeal, we address those not rendered moot by our disposition of Pacesetter's appeal. The Larsens allege that their claim for punitive damages, based on Pacesetter's bad faith conduct during settlement negotiations, should not have been dismissed. In addition, they argue that the trial court erred in ruling that their complaint did not adequately state a claim of fraud and in rejecting their motion to amend their complaint to include fraud. Finally, the Larsens maintain that they were entitled to attorney's fees because their implied warranty claim was an action "in the nature of assumpsit."

We vacate the trial court's award of postjudgment interest on prejudgment interest and remand for proceedings consistent with this opinion. In all other respects, the judgment of the trial court is affirmed.

## I.

David Larsen (plaintiff) was sixty–five years of age when he began experiencing episodes of lightheadedness and dizziness. He was diagnosed as having "sick sinus syndrome," a condition in which his heartbeat would occasionally decrease from a rate of sixty or seventy beats to as low as twenty beats per minute. Plaintiff's physician recommended that he install a pacemaker manufactured by defendant Pacesetter. Plaintiff was told by his physician that the pacemaker was a trouble–free device and that it would be seven years before the battery inside the pacemaker would have to be replaced. Pacesetter's Physician Manual recommended replacement after nine and a half years.

The surgery to implant the pacemaker was a success, and plaintiff was soon able to resume his normal activities. However, unbeknownst to plaintiff and his physicians, three Programalith III pacemakers had malfunctioned in the three months prior to plaintiff's August 1984 surgery and had been removed from patients and returned to Pacesetter. Pacesetter tested these units and determined that they malfunctioned at temperatures slightly above thirty–seven degrees centigrade, which is normal body temperature. The malfunction was caused by heat as well as by the electrical fields generated by individual pacemaker components which interacted when the components were brought together in the pacemaker shell. Defective devices had gone undiscovered before distribution because Pacesetter had monitored the output of heated, assembled Model 241 pacemakers at normal body temperature, but not above that temperature.[1] By

---

[1] Pacesetter tested the components of the Model 241 at temperatures up to fifty degrees centigrade, well above body temperature of

December 1984, Pacesetter began testing the output of assembled pacemakers heated to forty–five degrees centigrade.

By August 29, 1985, Pacesetter was aware that twenty–eight of a group of 648 Programalith III pacemakers had exhibited the same defective temperature sensitivity. Pacesetter informed hospitals of this fact in an advisory of that same date, and warned that other Programalith III units might also fail at temperatures slightly higher than normal body temperature. Pacesetter requested that unused devices be returned to the company for credit. The company also recommended that physicians consider replacing pacemakers listed in the advisory if the patients who had received them were pacemaker dependent. Plaintiff's pacemaker was among the listed units, and all three of his physicians considered him to be pacemaker dependent. [2] Plaintiff was informed of the risk of infection involved in operating on previously injured tissue, but was advised to remove and replace his pacemaker. He agreed to replacement surgery, which was performed in September 1985. The pacemaker was returned to Pacesetter where it was tested extensively and found not to exhibit defective temperature sensitivity.

The Programalith III pacemaker consists of a generator and a wire "lead" that carries electrical current to the

---

thirty–seven degrees centigrade. However this testing occurred while the pacemaker components were spread out in unassembled form. Pacesetter also monitored the output of assembled Model 241 pacemakers heated to fifty–five degrees centigrade, but only after the pacemakers had cooled to room temperature.

[2] Dr. Gilbert, one of plaintiff's physicians, testified that plaintiff did not depend on the pacemaker twenty–four hours a day but was dependent in that he would die if the pacemaker failed to function while plaintiff experienced the very low heart rates he had previously reported.

heart. The lead terminates in a barbed anchor designed to become entrapped in the heart muscle. Plaintiff's physicians replaced his original generator, connecting a new generator to plaintiff's original pacemaker lead. This lead subsequently malfunctioned and an additional surgery was performed to insert a second lead. The original lead was sewn into the heart because removal was determined to be too risky. Several other surgeries were performed to remedy complications arising from the first removal surgery. At the end of these procedures, plaintiff had three leads in his chest, two of which were sewn into the wall of his heart.

In June 1986 plaintiff reported sensations which included pain, dizziness, and "fullness" in his neck and head. His physician determined that the pacemaker leads left in plaintiff's heart had caused a clot to form in the major blood vessel carrying blood from the brain to the heart. This clot could not be removed. Six months later, a second clot, thought to have broken off the one in plaintiff's neck, was discovered in plaintiff's lung. This clot caused an infection in plaintiff's lungs and was finally removed after ten weeks of intensive antibiotic therapy administered by plaintiff's wife.

In order to avoid future episodes of infection, plaintiff's physicians performed major open chest surgery to remove the leads that had been sewn into plaintiff's heart and install two new leads. Four days later, another operation was performed to reinsert the re–sterilized pacemaker. On May 23, 1987, four months after his last surgery, plaintiff wrote Pacesetter requesting compensation for his suffering, medical expenses, loss of productivity, and inconvenience. After settlement negotiations were unsuccessful, plaintiff and his wife filed this claim in the Circuit Court of the First Circuit.

## II.

### A.   UCC STATUTE OF LIMITATIONS

Pacesetter argues that the trial court erred when it applied the four year statute of limitations under Hawaii's Uniform Commercial Code (UCC), Hawaii Revised Statutes (HRS) § 490:2–725 (1985), to plaintiff's implied warranty of merchantability claim.   Pacesetter maintains that the applicable statute of limitations is the two year period for personal injury actions under HRS § 657–7 (1985), and argues that plaintiff has failed to bring the action within the statutory period.

The UCC provides:   "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty." HRS § 490:2–318 (1985).   "An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued."   HRS § 490:2–725. "If any other provision of law is inconsistent with this chapter, this chapter shall govern unless this chapter or such inconsistent provision of law specifically provides otherwise."   HRS § 490:10–103.1 (1985).

Given the plain language of the UCC, as well as our decision in *Ontai v. Straub Clinic & Hospital, Inc.*, 66 Haw. 237, 249–52, 659 P.2d 734, 743 (1983) (Under § 490:2–318, patient Ontai could bring an action as a third party beneficiary of implied warranty running between General Electric, manufacturer of the X–ray table, and Straub hospital), it is difficult to imagine how the UCC statute of limitations would not apply to plaintiff's implied warranty claim. *See also Holliday v. Bell Helicopters Textron, Inc.*, 747 F. Supp. 1396, 1398 (D. Haw. 1990). Pacesetter relies on *Yoshizaki v. Hilo Hospital*, 50

Haw. 1, 427 P.2d 845, *reh'g granted*, 50 Haw. 40, 429 P.2d 829, *rev'd on other grounds*, 50 Haw. 150, 433 P.2d 220 (1967), as well as ***Higa v. Mirikitani***, 55 Haw. 167, 517 P.2d 1 (1973), as cases in which this court applied the two year personal injury statute of limitations. However, both cases may be distinguished as involving contracts for services rather than goods. We conclude that the trial court was correct when it applied the UCC statute of limitations under HRS § 490:2–725 to plaintiff's claim of breach of implied warranty.

## B. PREEMPTION

Article VI of the United States Constitution provides that the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Review under the Supremacy Clause begins with the " 'assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.' " ***Cipollone v. Liggett Group, Inc.***, 112 S. Ct. 2608, 2617 (1992) (citing ***Rice v. Santa Fe Elevator Corp.***, 331 U.S. 218, 230 (1947)). Congress may preempt state law expressly, ***Jones v. Rath Packing Co.***, 430 U.S. 519, 525, *reh'g denied*, 431 U.S. 925 (1977), or indirectly, where conflict between federal and state law makes "compliance with both federal and state regulations . . . a physical impossibility . . . ." ***Florida Lime & Avocado Growers, Inc. v. Paul***, 373 U.S. 132, 142–43, *reh'g denied*, 374 U.S. 858 (1963). In the absence of direct conflict or express preemptive language, the intent to preempt may be implied from a scheme of federal regulation sufficiently comprehensive reasonably to support

the inference that Congress "left no room" for state regulation. *Rice*, 331 U.S. at 230.

Whenever statutory interpretation involves the reconciliation of conflicting policies and full understanding of the applicable policies depends on more than ordinary knowledge respecting the matters subjected to agency regulations, the agency's interpretation will be reviewed only for an abuse of discretion. *United States v. Shimer*, 367 U.S. 374, 381–82 (1961). Thus, administrative regulations may have a preemptive effect on state law equal to that of federal statutes, and unless the agency's position is inconsistent with clearly expressed congressional intent or subsequent developments reveal a change in Congress' position, the regulations of the federal agency charged with administering a federal act are dispositive on the question of preemption. *See Florida v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 714–15 (1985).

In 1976, Congress enacted the Medical Device Amendments to 21 U.S.C. §§ 301–360 (1976), the Drugs and Devices section of the Federal Food, Drug, and Cosmetic Act. Pub. L. No. 94–295, § 2, 90 Stat. 574 (1976). The amendments were enacted in response to the rapid technological change in the medical device field, and the perceived inadequacy of existing law to protect consumers from "increasingly complex devices which pose serious risk if inadequately tested or improperly designed or used." S. REP. No. 33, 94th Cong., 2d Sess. 5, *reprinted in* 1976 U.S. CODE CONG. & ADMIN. NEWS 1070, 1075. The provision of the Act controlling preemption is 21 U.S.C. § 360(k), subsection (a) of which provides:

> Except as provided in subsection (b) of this section, no State or political subdivision of a ͻtate

may establish or continue in effect with respect to a device intended for human use any requirement—

> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and

> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

In 1978, the Food and Drug Administration (FDA) promulgated regulations implementing § 360(k). Under 21 C.F.R. § 808.1(b) (1992), § 360(k) applies to any state requirement "having the force and effect of law (whether established by statute, ordinance, regulation or court decision) . . . ." Under 21 C.F.R. § 808.1(d) (1992): "State or local requirements are preempted only when the Food and Drug Administration has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act . . . ."

The language of § 808.1(d) is consistent with that of § 360(k). An examination of the language and legislative history of the Medical Device Amendments, as they existed when § 808.1(d) was promulgated in 1978, reveals no clearly expressed legislative intent contrary to the regulation. The regulation's somewhat restrictive reading of § 360(k)(a)(2) is also consistent with the legislative history of the Act, which reveals that Congress was concerned with *increasing* the protection afforded medical device consumers under existing law rather than with *restricting* or reforming the law in existence at the time of the Act. Moreover, in 1990, subsequent to FDA promulgation of § 808.1(d), Congress amended the Medical

Device Amendments of 1976. The purpose of the legislation was to "modify the underlying law in ways that will result in *greater* protection of the public health." H.R. REP. No. 1808, 101st Cong., 2d Sess. 13, *reprinted in* 1990 U.S. CODE CONG. & ADMIN. NEWS 6305, 6306 (emphasis added). The 1990 amendments left § 360(k) untouched, providing evidence that § 808.1(d) is an accurate reflection of Congressional intent under § 360(k). We conclude that both § 360(k) and § 808.1(d) govern the scope of preemption under the Medical Device Amendments.

Federal requirements sufficiently specific to trigger a preemption analysis under §§ 360(k) and 808.1(d) have been found in two situations. Labeling and packaging regulations have been found to preempt state law claims of failure to adequately label and warn that are different from or in addition to requirements established by the FDA. *See, e.g., Rinehart v. International Playtex, Inc.*, 688 F. Supp. 475, 477 (S.D. Ind. 1988). In addition, in a case recently decided by the Seventh Circuit, FDA "Investigational Device Exemptions" exempting certain devices from usual premarket safety requirements in order to encourage product innovation, were found to preempt a claim that an experimental intraocular device was defectively designed. *Slater v. Optical Radiation Corp.*, 961 F.2d 1330, 1331–33, *reh'g denied*, (7th Cir.), *cert. denied*, ___ U. S. ___, 113 S. Ct. 327 (1992); *cf. Mitchell v. Iolab Corp.*, 700 F. Supp. 877 (E.D. La. 1988) (plaintiff's design defect claims not preempted by Investigational Device Exemption regulations). In both contexts, state law claims would contradict federal law by imposing requirements "different from . . . any requirement applicable under [the Drugs and Devices] chapter to the device." Accordingly, in the absence of sufficiently specific FDA

regulations pertaining to device design and construction, state law claims of defective design, composition and construction of tampons have been found to fall outside of the preemptive scope of § 808.1(d). *Moore v. Kimberly-Clark Corp.*, 867 F.2d 243, 247 (5th Cir. 1989); *Bejarano v. International Playtex, Inc.*, 750 F. Supp. 443, 446 (D. Idaho 1989).

We have found no specific statutes or regulations applicable to the particular device in question in this case. Moreover, Congress and the FDA did not choose to cap the level of safety regulation applicable to the device by awarding the device an experimental exemption. Pacesetter argues that its device was subject to the premarket approval process and that plaintiff's claim contradicts the FDA's decision to approve sales of the pacemaker made pursuant to that process. However, the statutes and regulations governing premarket approval set forth general procedural requirements and, therefore, do not trigger a preemption analysis under § 808.1(b). Further, plaintiff's device was a Class III device under the Act, and was found to be "substantially equivalent" to devices already on the market. In the legislative history of the 1990 amendments, Congress stated that:

> over 80 percent of the devices that are potentially the most dangerous (Class III), enter the market on the basis of a claim by the manufacturer that they are "substantially equivalent" to a device already on the market. Although a determination of substantial equivalence involves a review by FDA of what is known of the safety and effectiveness of the devices, and may even include some additional clinical testing, it is not equivalent to an approval by the FDA of the device's safety and effectiveness.

H.R. REP. NO. 101–8081, *supra*, at 14, 1990 U.S. CODE CONG. & ADMIN. NEWS at 6307. *See also* 21 C.F.R. § 807.97 (FDA's acceptance of claim of substantial equivalence does not in any way denote official approval of the device). Thus, meritorious claims of the type brought by plaintiff would not contravene FDA "approval" of the device and would further Congressional intent by providing pacemaker manufacturers a product safety incentive in those areas where the premarket approval process has failed adequately to protect the consumer. We conclude that plaintiff's implied warranty claim was not preempted by the Federal Food, Drug, and Cosmetics Act.

## C. REVIEWABILITY OF SUMMARY JUDGMENT

Pacesetter appeals the circuit court's denial of its motion for summary judgment on plaintiffs' implied warranty claim. Plaintiffs urge this court to dismiss Pacesetter's appeal, arguing that "the vast majority of courts" have held orders denying motions for summary judgment unreviewable when the appeal is taken after a trial on the merits.

A summary judgment motion is viewed as going to the merits of the case and will be granted only when the pleadings, depositions, affidavits, and other materials submitted to the court show that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Miller v. First Hawaiian Bank*, 61 Haw. 346, 349, 604 P.2d 39, 41 (1979); 10 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2712, at 584 (1983); HAWAII RULES OF CIVIL PROCEDURE (HRCP) Rule 56.

At an early stage in the development of the motion for summary judgment, the rule developed that an order

denying the motion could not be appealed if denial was based on the presence of factual questions for the jury, but could be appealed if based on questions of law. J. Rothschild, *Simplification of Civil Practice in New York: A Review of Judicial Experience Under the Civil Practice Act*, 23 COL. L. REV. 618, 648 (1923). This rule seems to explain the holding in **Morgan v. American University**, 534 A.2d 323 (D.C. App. 1987), the case upon which plaintiff relies for its assertion that denials of summary judgments are unreviewable. In *Morgan*, the court reasoned that where summary judgment was denied because of the existence of issues of fact and the case was subsequently decided by the jury, reversal on appeal would allow a decision based on less evidence, to prevail over one reached on more. *Id.* at 326. Significantly, however, the court also ruled that any *legal* rulings made by the trial court at summary judgment *could* be reviewed on appeal. *Id.* at 327.

We therefore conclude that the *Morgan* rule is inapposite to this case. It is clear from the record that the issue argued and decided on summary judgment—whether the defect asserted by plaintiff was actionable—was a question of law. In this jurisdiction, an appeal lies from a court order which resolves a motion for summary judgment as a question of law. *See* **Vega v. National Union Fire Ins. Co.**, 67 Haw. 148, 152, 682 P.2d 73, 76 (1984). We conclude that Pacesetter is entitled to a review of the trial court's denial of its motion for summary judgment.

### D. DEFECT

Pacesetter claims that the trial court should have granted its motion for summary judgment on plaintiffs' claim for breach of the implied warranty of merchantability because plaintiff's pacemaker did not

malfunction and was therefore not defective. Plaintiffs argue in rebuttal that an action in implied warranty does not require proof of a defect. They also maintain that the scope of the term "defect" is broader in warranty than in tort and that the pacemaker was unfit, i.e., not of merchantable quality and thus defective because there was an unreasonable and unacceptable risk that it might malfunction and cause plaintiff's death.

We first address plaintiffs' contention that proof of defectiveness is not required in an implied warranty action. "Defectiveness" is the term used to describe the actionability of a product in connection with strict products liability actions in tort. *See Stewart v. Budget Rent-A-Car Corp.*, 52 Haw. 71, 74–75, 470 P.2d 240, 242–43 (1970); *Ontai*, 66 Haw. at 240, 659 P.2d at 739. "Unfitness" is the term associated with products liability actions in implied warranty. *See* HRS § 490:2–314(2)(c) (1985); *Ontai*, 66 Haw. at 250, 659 P.2d at 744; J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 9–8, at 475 (1988). However, despite the disparity in terminology, many courts and commentators have concluded, and we agree (to the extent that the implied warranty action is based on a claim of personal injury), that any difference between the two standards is largely formal. *See, e.g., Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 94–95 (3d Cir. 1983); WHITE & SUMMERS, *supra*, § 9–8, at 475.

The implied warranties of fitness and merchantability were originally developed to compensate product purchasers for intangible economic losses. W. KEETON, PROSSER AND KEETON ON TORTS § 95A, at 679–81 (5th ed. 1984). Warranty liability was gradually expanded to encompass physical harm to persons and tangible things. *Id.* § 96, at 681–83. At the same time,

courts began to utilize fictions to circumvent the contractual requirement of privity, which precluded recovery by consumers who were injured by a defective product but who had not directly purchased the product from the defendant manufacturer or seller. *Id.* § 97, at 690; W. Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 YALE L.J. 1099, 1124 n.53 (1960).

In *The Assault Upon the Citadel*, Dean William Prosser[3] discussed the formal deficiencies of the warranty theory as a basis for personal injury recovery by consumers of defective products. He concluded that traditional warranty concepts, such as privity, notice, and disclaimers, were part of "an illusory contract mask," and that " 'warranty' as a device for the justification of strict liability to the consumer, carries far too much luggage in the way of undesirable complications . . . ." *Id.* at 1127–34. He called for the declaration of a new action in tort independent of warranty. *Id.*

Three years later, in ***Greenman v. Yuba Power Products, Inc.***, 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963), the California Supreme Court discarded the fiction of warranty, reasoning that its attendant contractual rules "were developed to meet the needs of commercial transactions [and] cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed." *Id.* at 63, 377 P.2d at 901. *Greenman* established a products liability action governed by the law of tort.[4] In 1964 the American

---

[3] Chief Reporter for the Restatement (Second) of Torts.

[4] Justice Traynor, who wrote the opinion in *Greenman*, was a member of both the Reporter's Advisory Committee and the Council of the

Law Institute accepted § 402A of the Restatement (Second) of Torts. *Greenman* was followed by ***Cronin v. J.B.E. Olson Corp.***, 8 Cal. 3d 121, 104 Cal. Rptr. 433, 501 P.2d 1153 (1972), and ***Barker v. Lull Engineering Co.***, 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), in which the California Supreme Court refined the State's law of products liability. This court cited *Greenman* with approval in *Stewart* and adopted a rule of strict products liability which was "essentially the rule adopted in the *Second Restatement of Torts*, Section 402A." ***Stewart***, 52 Haw. at 74–75 & n.3, 470 P.2d at 243 & n.3. The definition of design defect developed in *Cronin* and *Barker* was adopted in *Ontai*, 66 Haw. at 242–43, 659 P.2d at 739–40.

Thus the tort action for strict products liability is the warranty action for tangible injury to persons and property stripped of its contractual mask. Plaintiffs are consequently correct in arguing that the concept of defectiveness in a *contractual* warranty action is broader than in tort, where the product defect is alleged to have caused solely tangible economic loss. *See* WHITE & SUMMERS, *supra*, § 9–8, at 475; KEETON, *supra*, § 95, at 680 (UCC regarded as exclusive source for ascertaining seller's liability where claim is intangible economic loss not attributable to physical injury to person or tangible thing other than the product itself).[5] Where purely economic

American Law Institute when § 402A of the Restatement (Second) of Torts was subjected to critical discussion. John W. Wade, *Design Defects*, 33 VAND. L. REV. 551, 554 (1980).

[5] Commentators and courts have also acknowledged a possible difference between the elements of a warranty and strict liability action based on the Restatement (Second) of Torts § 402A requirement that the product be "unreasonably dangerous" to the user. *See, e.g.*, WHITE

loss is the gravamen of the complaint, courts have recognized the value of retaining the traditional limitations of contract actions. *Seely v. White Motor Co.*, 63 Cal. 2d 9, 45 Cal. Rptr. 17, 403 P.2d 145 (1965). However, where a plaintiff seeks to recover for personal injury in warranty, the elements of the action should be governed by the same policies which presently shape the elements of a tort strict products liability claim. We conclude that to bring an action in implied warranty for personal injury a plaintiff is required to show product unmerchantability sufficient to avoid summary judgment on the issue of defectiveness in a tort strict products liability suit.

We now turn to the question of whether plaintiffs' pacemaker was defective. Pacesetter argues that its product is not defective on two grounds. First, Pacesetter maintains that pacemakers fall under comment k to § 402A of the Restatement. Second, Pacesetter claims that the pacemaker was not defective because it did not malfunction.

The rules defining and governing an implied warranty or tort products liability action for personal injuries must serve the purposes for which products liability is imposed. *See Greenman*, 59 Cal. 2d at 63, 377 P.2d at 901. Thus, a court should determine whether a plaintiff has met his burden of showing a *prima facie* case of product defectiveness in light of the policies that have supported judicial development of the implied warranty and tort strict products liability action for personal injuries. *Cepeda v. Cumberland Eng'g Co.*, 76 N.J. 152, 173–75, 386 A.2d 816, 826–27 (1978) (whether design defect exists

---

& SUMMERS, *supra*, § 9–8, at 475. However, the standard does not apply to products liability suits under *Brown v. Clark Equipment Co.*, 62 Haw. 530, 542–43, 618 P.2d 267, 275 (1980).

should be decided by considering various risk–utility factors); *see **O'Brien v. Medtronic, Inc.**,* 149 Wis. 2d 615, 439 N.W.2d 151 (Wis. Ct. App.) (court decides question of defectiveness by considering the purposes of strict products liability), *review denied,* 446 N.W.2d 286 (Wis. 1989); J. Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 838–39 (1973). Policies justifying the development of the implied warranty and strict torts products liability action include:

1) Liability will compensate consumers or users whose expectations are frustrated by the defective product.

2) The costs of injury due to defective products may best be borne by enterprisers who make and sell the product, profit from sales, and who can shift the costs to purchasers.

3) Liability will promote product safety by eliminating the necessity of proving negligence.

Keeton, *supra,* § 98, at 692–93; ***Stewart,*** 52 Haw. at 74–75, 470 P.2d at 242–43.[6]

---

[6] In *On the Nature of Strict Tort Liability for Products,* John Wade identifies the following factors as relevant to determine whether a product is defective:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

Comment k focuses on cost and product safety policy considerations.  Under comments k and m to § 402A of the Restatement, an "unavoidably unsafe product" is not defective for purposes of tort or warranty strict products liability.  Under comment k, unavoidably unsafe products are those "incapable of being made safe for their intended and ordinary use." Such products, "properly prepared and accompanied by proper directions and warning . . . [are] not defective . . . ." Comment k encompasses products like new or experimental drugs as to which there can be no assurance of safety "because of lack of time and opportunity for sufficient medical experience, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk." RESTATE-MENT (SECOND) OF TORTS, *supra*, § 402A comment k at 353–54.  Accordingly, comment k applies to products which, by their very nature, cannot be made safe, and those upon which liability will not be imposed because the risk of harm is jusitified by the possible benefits of releasing such products on the market.

The Programalith III Series Model 241–6 pacemaker was demonstrably capable of being made safe for its intended use, as evidenced by Pacesetter's ability to detect the potential product malfunction at elevated body temperatures through appropriate factory testing.  Further, in light of the documented medical experience with

---

(6)  The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7)  The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

J. Wade, *supra*, at 837–38 (footnote omitted).

it, we do not believe this pacemaker was sufficiently analogous to a new and experimental drug to warrant comment k exemption from strict products liability. The record establishes that at the time Pacesetter manufactured and distributed its product there were many different types of pacemakers available on the market, all of which were designed to perform the same function as Pacesetter's device. We therefore conclude that the device was not an unavoidably unsafe product within the meaning of comment k.

Pacesetter argues that its product was not defective because it did not malfunction. However, neither the tort nor the warranty formulations of the test for product defectiveness heretofore enacted by the legislature or adopted by this court require that a product actually malfunction.[7] Moreover, although Pacesetter relies on *Khan v. Shiley, Inc.*, 217 Cal. App. 3d 848, 266 Cal. Rptr. 106,

---

[7] HRS § 490:2–314(2) provides:

(2) Goods to be merchantable must be at least such as

(a) Pass without objection in the trade under the contract description; and

(b) In the case of fungible goods, are of fair average quality within the description; and

(c) Are fit for the ordinary purposes for which such goods are used; and

(d) Run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) Are adequately contained, packaged, and labeled as the agreement may require; and

(f) Conform to the promises or affirmations of fact made on the container or label if any.

In *Ontai* this court stated that to bring a tort strict products liability action, plaintiff must demonstrate that "because of its manufacture or design, the product does not meet the reasonable expectations of the ordinary consumer or user as to its safety." *Ontai*, 66 Haw. at 241, 659 P.2d at 739.

*review denied* (1990), in which a heart valve that had not malfunctioned was found not defective, we find that the facts of that case, viewed in light of the policy considerations supporting products liability, are distinguishable from those of the instant action.

In *Khan*, plaintiff sued for emotional distress damages after she learned that her heart valve was within a group of valves recalled due to a propensity to fracture. Plaintiff's physician advised her that the risk of a second open–heart surgery was even higher than the risk due to the possibility of malfunction; she did not replace the valve and it did not malfunction. The California Court of Appeals held on the facts before it that claims for relief sounding in negligence, strict liability, and warranty products liability were unavailable to the plaintiff. The court stated that "proof that the product ha[d] malfunctioned [was] essential to establish liability for an injury *caused by the defect*" and held that, so long as the valve continued to function, the defendant manufacturer had not breached any duty of care owed to plaintiff. *Id.* at 110, 111 (emphasis in original).

***O'Brien v. Medtronic, Inc.***, 149 Wis. 2d 615, 439 N.W.2d 151, *review denied*, 446 N.W.2d 286 (1989), a case similar to *Khan*, involved surgical replacement of plaintiff's pacemaker lead. In *O'Brien*, plaintiff's pacemaker lead was found to have had an abnormally high failure rate. His physician did not consider him to be pacemaker dependent and had informed him that the manufacturer recommended monthly monitoring of the lead. However, plaintiff insisted that his physician replace the lead. In order to alleviate plaintiff's extreme emotional distress, his physician eventually complied, whereupon plaintiff suffered complications requiring additional surgery. The court stated that although it was not holding

that a cause of action existed only where the specific unit was defective, there was nevertheless an insufficient causal relationship between the manufacturer's conduct and plaintiff's injuries to support a claim for relief.

In this case, as in *Khan* and *O'Brien*, plaintiff's injury was allegedly caused by the propensity of a product which was designed to be implanted in the body, to malfunction. However, when the causal nexus between defect and injury is examined, both *Khan* and *O'Brien* are distinguishable from this case. In *Khan*, plaintiff had suffered no physical injury from surgery or product malfunction and complained solely of emotional distress caused by the knowledge that her heart valve might potentially malfunction. Allowing plaintiff to recover for emotional distress on the specific record before the court would allow *any* recipient of the same model heart valve to recover from the manufacturer.[8] In *O'Brien*, plaintiff was not pacemaker dependent, his physician advised against replacement, and plaintiff's surgical injuries could be viewed as, in large part, self-inflicted. Thus, both *Khan* and *O'Brien* raised the issue of the fairness of imposing liability upon the manufacturer far in excess of the degree to which its product was actually defective. Accordingly, in both cases it was not clear whether imposing liability on the defendant would be consistent with and further the policy considerations supporting products liability.

In this case, unlike *O'Brien* and *Khan*, there is clear legal causation between plaintiff's injury and the alleged

---

[8] In fact, the *Khan* court noted that the plaintiff's lawsuit was not unique, that the same claims had been brought in five other cases, and that plaintiff's attorneys had instituted virtually identical lawsuits on behalf of sixteen similarly situated valve recipients in Orange County Superior Court. *Khan*, 217 Cal. App. 3d at 855 n.11, 266 Cal. Rptr. at 110 n.11.

product defect. Unlike the plaintiff in *O'Brien*, plaintiff's decision in this case to replace the device was forced upon him. Plaintiff was advised that he was in fact pacemaker dependent, Pacesetter expressly recalled its admittedly failure–prone product and recommended pacemaker replacement in such patients, and, in reliance on Pacesetter's advisory, plaintiff's physicians recommended that the Programalith III be replaced. Unlike the plaintiff in *Khan*, there are few problems of proof or unlimited liability. Plaintiff in this case suffered actual physical injuries as a result of his replacement surgeries, distinguishing him from the general class of persons with similar implants.

Thus, the balance in this case is tipped toward imposing liability on Pacesetter. Plaintiff was in the limited class of pacemaker recipients who would almost certainly be injured by the pacemaker's potential to malfunction, and whose severe injuries were foreseeable, indisputable, and plainly caused by the pacemaker's condition. Imposition of liability in this case will therefore advance the policy goals of products liability by compensating consumers of defective products for personal injuries caused by the frustration of their reasonable expectations, and will do so fairly, on behalf of a limited and foreseeable group of product consumers. The record also establishes that Pacesetter could have discovered the defect at little cost by performing the very tests that it had initiated in December 1984. Consequently, imposing liability on Pacesetter will promote product safety by encouraging manufacturers to anticipate and test for foreseeable defects likely to cause severe injury.

We conclude that plaintiff's pacemaker was in a defective and therefore unmerchantable condition sufficient to

support an action for breach of the implied warranty of merchantability.

### E. BAD FAITH SETTLEMENT CONDUCT

Plaintiffs allege that they should have been allowed to claim punitive damages because of Pacesetter's bad faith conduct during the course of settlement negotiations. They claim that during settlement negotiations, Pacesetter's associate general counsel made knowing misrepresentations that induced them to refrain from seeking legal counsel until the two–year personal injury statute of limitations under HRS § 657–7 had run on their claims. Plaintiffs maintain that all the elements of common law fraud were established by Pacesetter's conduct.

An action based on fraud will not lie where plaintiff has suffered no injury or damage. *Hawaii's Thousand Friends v. Anderson*, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (to support a finding of fraud there must be clear and convincing evidence that plaintiff suffered substantial pecuniary damage). In this case, plaintiffs claim that Pacesetter's alleged fraud injured them by luring them into delaying the filing of their action until the personal injury statute of limitations had run, depriving them of recovery under any theories subject to HRS § 657–7. We have held, however, that plaintiffs claims are governed by the statute of limitations set forth in HRS § 490:2–725 rather than HRS § 657–7. Plaintiffs have therefore suffered no injury due to Pacesetter's bad faith conduct, and the trial court correctly dismissed any of plaintiffs' claims based thereupon.

### F. FRAUDULENT SALE

Plaintiffs claim that Pacesetter committed fraud when it sold him the defective pacemaker. They maintain

that this claim was adequately pleaded in their First Amended Complaint and that the trial court erred in ruling to the contrary. Plaintiffs assert, in the alternative, that the court should have allowed them to amend their First Amended Complaint to include fraud.

Plaintiffs did not specify fraud in their complaint and rely on our decision in *Hall v. Kim*, 53 Haw. 215, 491 P.2d 541 (1971), in which we stated that: "[i]t is not necessary to plead under what particular law the recovery is sought." *Id.* at 221 (quoting *United States v. Missouri–Kansas–Texas R.R.*, 273 F.2d 474 (10th Cir. 1959). *Hall* is inapposite to this case. The plaintiff in *Hall* alleged violation of specific statutes or regulations, while plaintiffs in this case are alleging fraud.

The elements of fraud include: 1) false representations made by the defendant; 2) with knowledge of their falsity (or without knowledge of their truth or falsity); 3) in contemplation of plaintiff's reliance upon them; and 4) plaintiff's detrimental reliance. *Hawaii's Thousand Friends*, 70 Haw. at 286, 768 P.2d at 1301. HRCP Rule 9(b) provides that "[i]n all averments of fraud . . . the circumstances constituting fraud or mistake shall be stated with particularity." The rule is designed, in part, to insure the particularized information necessary for a defendant to prepare an effective defense to a claim which embraces a wide variety of potential conduct. 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1296, at 580 (1990). Thus, under Rule 9(b) general allegations of "fraud" are insufficient because they serve little or no informative function, *Wolfer v. Mutual Life Ins. Co.*, 3 Haw. App. 65, 67, 641 P.2d 1349, 1359 (1982) (citing 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1298, at 415 (1969)); rather, a plaintiff must state the circumstances constituting fraud or mistake with particularity (e.g., allege who

made the false representations) and specify the represen-
tations made. *Ellis v. Crockett*, 51 Haw. 45, 59, 451 P.2d
814, 823 (1969).

We find that plaintiffs' First Amended Complaint not
only failed to set forth particularized allegations regard-
ing the circumstances constituting fraud, but that it was
also flawed at a more basic level. Plaintiffs' complaint
failed altogether to set forth a distinct claim for relief
sounding in fraud. The complaint asserted piecemeal that
Pacesetter sold plaintiff a pacemaker although Pacesetter
knew that the pacemaker was defective. It also stated
that in placing the product on the market, Pacesetter rep-
resented that the pacemaker would safely perform the
function for which it was intended. Finally, the *ad dam-
num* clause prayed, *inter alia*, for punitive damages.
"Fraud" was never expressly alleged in the complaint, and
the complaint neglected to allege detrimental reliance.
Punitive damages may be recovered in a products liability
suit, in the absence of a fraud claim, so long as defendant
has acted "wantonly or oppressively or with . . . malice."
*Masaki v. General Motors Corp.*, 71 Haw. 1, 11, 780
P.2d 566, 572 (1989) (citations omitted). We consequently
agree with the trial court that plaintiffs' complaint was
ambiguous and conclude that their complaint did not give
Pacesetter fair notice of a fraud claim with sufficient par-
ticularity to satisfy the requirements of Rule 9(b).

Although in some circumstances dismissal of a claim
would be a "drastic sanction for a pleading defect . . . at
odds with the liberal approach to pleading of the . . . rules
as a whole," 5 Wright & Miller, *supra*, § 1296, at 582, in
this case the trial court's decision to deny plaintiffs'
motion to amend and include a claim for fraud was not an
abuse of discretion.

HRCP Rule 15(a) allows a party to amend his pleadings once by right and thereafter only by discretionary leave of court. In the absence of an apparent or declared reason, leave should be freely given when justice so requires. *Keawe v. Hawaiian Elec. Co.*, 65 Haw. 232, 239, 649 P.2d 1149, 1154 (1982). After filing their First Amended Complaint, plaintiffs filed two pretrial statements, both of which enumerated the various theories, (e.g., negligence) under which they were bringing the action. Neither the first nor the second pretrial statement alluded to fraud. The trial court found that plaintiffs' pretrial statements resolved any ambiguity in the First Amended Complaint and that Pacesetter was justified in its belief that fraud was not at issue. The court also determined that Pacesetter had relied on the absence of a claim for fraud when it conducted discovery and that Pacesetter would be unfairly prejudiced if plaintiffs were allowed to add a fraud claim on the eve of trial. In our view, the court's decision was reasonably supported and we therefore hold that it did not abuse its discretion in denying plaintiffs' motion to amend their First Amended Complaint.

### G. LIMITED WARRANTY

Pacesetter appeals the trial court's order *in limine* preventing it from introducing evidence of its limited warranty. Pacesetter argues that neither the trial court nor plaintiffs refuted the fact that its limited warranty complied with the statutory provision governing exclusion or modification of warranties. We conclude, however, that Pacesetter fails adequately to address HRS § 490:2–719 (1985), the primary obstacle to introduction of its limited warranty. The statute provides that "[c]onsequential damages may be limited or excluded unless the

limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable . . . ." Pacesetter makes no attempt to rebut the presumption of unconscionability and appears, instead, to be arguing that persons who are not in privity with the seller of a product deserve a lesser level of protection under the UCC than those who are in privity. We find Pacesetter's arguments both unconvincing and contrary to the plain language of HRS § 490:2–318 which provides that a seller's warranty extends to "any person who may reasonably be expected to use, consume or be affected by the goods . . . ." We conclude that Pacesetter has failed to rebut the presumption of unconscionability under § 490:2–719.

## H. ASSUMPTION OF RISK

Pacesetter claims that the jury should have been instructed on assumption of risk.

In this jurisdiction, principles of pure comparative negligence apply to strict products liability actions. *Armstrong v. Cione*, 69 Haw. 176, 180–83, 738 P.2d 79, 82–83 (1987); *Hao v. Owens–Illinois, Inc.*, 69 Haw. 231, 236, 738 P.2d 416, 418–19 (1987). Under *Armstrong*, and our reasoning in part II. D. of this decision, we join those jurisdictions that have merged pure comparative negligence with personal injury suits in implied warranty. *Armstrong*, 69 Haw. at 180–83, 738 P.2d at 82–83; *Pepsi Cola Bottling Co. v. Superior Burner Serv. Co.*, 427 P.2d 833 (Alaska 1967); *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, *rev'd*, 665 S.W.2d 439 (Tex. 1984); *West v. Caterpillar Tractor Co.*, 336 So. 2d 80 (Fla. 1976). Where comparative negligence principles apply, assumption of risk that is a form of contributory negligence serves to reduce, rather than bar, plaintiff's recover-

ies. *See Kaneko*, 65 Haw. at 463, 654 P.2d at 352; *Bulatao v. Kauai Motors, Ltd.*, 49 Haw. 1, 15, 406 P.2d 887, 895, *reh'g denied*, 49 Haw. 42, 408 P.2d 396 (1965). However, it is not clear from our previous decisions whether assumption of risk that is not a form of contributory negligence survives the merger of comparative negligence and products liability.

The doctrine of assumption of risk has been a subject of much controversy and confusion, in large part because it encompasses, under the deceptively simple construct that a plaintiff has deliberately subjected himself to danger, the concepts of plaintiff's consent, defendant's lack of duty, and plaintiff's contributory negligence. J. Wade, *The Place of Assumption of Risk in the Law of Negligence*, 22 LA. L. REV. 5, 14 (1961); *see generally* F. James, *Assumption of Risk*, 61 YALE L.J. 141 (1952); KEETON, *supra*, § 68, at 480. The defense is not a favored one and the trend in the law has been toward abolishing it.[9] *Blackburn*, 348 So. 2d at 289; 4 F. HARPER, F. JAMES, & O. GRAY, THE LAW OF TORTS § 21.0 n.4, at 190 (2d ed. 1986); *see generally* H. WOODS, COMPARATIVE FAULT § 6, at 131–163, 499–788 (2d ed. 1987). The doctrine has been criticized as duplicative of more widely understood concepts such as duty and as adding "nothing to modern law except confusion," James, *supra*, at 169; Wade, *Assumption of Risk, supra*, at 14; HARPER, JAMES &

---

[9] The defense first developed in the employment context and in effect gave the employer a second bite at the issue of the employer's duty to the employee. *Tiller v. Atlantic Coast Line R.R.*, 318 U.S. 54, 68–69 (1943) (Frankfurter, J., concurring). In that context the defense was criticized as a "morally unacceptable social policy . . . calculated to advance the industrial revolution regardless of the cost in human suffering." *Blackburn v. Dorta*, 348 So. 2d 287 (Fla. 1977) (citing *Tiller*, 318 U.S. at 68–69). *See generally* James, *supra*.

GRAY, *supra*, § 21.0, at 193 (describing "The Battle of the Wilderness," the name by which drafters of Restatement (Second) of Torts designated debate over whether to include the defense).

Assumption of risk may be express, in the sense of an express contract. *See **Heil Valley Ranch, Inc. v. Simkin**,* 784 P.2d 781 (Colo. 1989) (express release waiving any claim as a result of physical injury incurred while horseback riding); ***Tunkl v. Regents of Univ. of Cal.***, 60 Cal. 2d 92, 32 Cal. Rptr. 33, 383 P.2d 441 (1963) (hospital patient's express agreement to assume risks of medical negligence invalid as contrary to public policy); ***Schneider v. Revici***, 817 F.2d 987 (2d Cir. 1987) (statute recognizing "covenant not to sue").

Implied assumption of risk has been used in the context of negligence cases to describe two distinct theories under which a defendant may avoid liability. The "primary" sense of implied assumption of risk emerged, along with the global doctrine itself, out of the common law action of a servant against his master. KEETON, *supra*, § 68 n.1, at 480. Used in its primary sense, assumption of risk describes the act of a plaintiff, who has entered voluntarily and reasonably into some relation with a defendant, which plaintiff knows to involve the risk. It is an alternate expression of the proposition that a defendant owes no duty to a plaintiff. RESTATEMENT (SECOND) OF TORTS § 496A comment c; ***Meistrich v. Casino Arena Attractions, Inc.***, 31 N.J. 44, 48, 155 A.2d 90, 93 (1959).[10] Primary implied assumption of risk may be

---

[10] We relied on *Meistrich* in *Bulatao*, in which we first declined to permit reliance on both assumption of risk and contributory negligence where the defenses were forms of one another. ***Bulatao***, 49 Haw. at 15, 406 P.2d at 895.

illustrated by the case in which a plaintiff has been injured as a natural incident of engaging in a contact sport. It may also be seen in the act of a spectator entering a baseball park, thereby consenting that the players proceed without taking precautions to protect her from being hit by the ball. RESTATEMENT (SECOND) OF TORTS § 496A comment c; *Ordway v. Superior Court*, 198 Cal. App. 3d 98, 243 Cal. Rptr. 536 (1988).

In its "secondary" sense, implied assumption of risk focuses on a plaintiff's conduct, and describes a situation where plaintiff knows of the danger presented by a defendant's negligence and proceeds voluntarily and unreasonably to encounter it. *Meistrich*, 31 N.J. at 53, 155 A.2d at 93–94; RESTATEMENT (SECOND) OF TORTS § 496A comment c. A plaintiff's assumption of risk is unreasonable, and a form of contributory negligence, where the known risk of harm is great relative to the utility of plaintiff's conduct. RESTATEMENT (SECOND) OF TORTS § 496A comment c. It is implied assumption of risk in this secondary sense, i.e. *unreasonable* assumption of risk, that has been merged with comparative negligence by the decisions of this court in products liability cases.

We conclude that express assumption of risk survives the merger with comparative negligence in products liability cases and hold that express assumption of risk is available as a separate defense that may bar plaintiff's recovery in tort and warranty strict products liability actions. Express assumption of risk is essentially contractual in nature and does not conflict with the basic concept of apportionment under comparative fault involving negligence. KEETON, *supra*, § 68, at 496; M. BENDER, COMPARATIVE NEGLIGENCE LAW § 4.20[2], at 444 (1992). Thus, courts abolishing implied assumption of risk under comparative negligence have recognized the continued

vitality of express assumption, *see Valley Nat'l Bank v. National Ass'n for Stock Car Auto Racing, Inc.*, 153 Ariz. 374, 736 P.2d 1186 (Ct. App. 1987); *Farley v. M M Cattle Co.*, 529 S.W.2d 751 (Tex. 1975); *Black v. District Bd. of Trustees*, 491 So. 2d 303 (Fla. App.), *review denied*, 500 So. 2d 543 (Fla. 1986); the same is true in jurisdictions in which comparative negligence statutes have expressly abolished the defense of assumption of risk. *See, e.g., Blair v. Mt. Hood Meadows Dev. Corp.*, 291 Or. 293, 630 P.2d 827, *reh'g denied and opinion modified by* 291 Or. 703, 634 P.2d 241 (1981).

However, we join those courts that have abolished primary implied assumption of risk in strict products liability and implied warranty actions for personal injury and have retained secondary implied assumption of risk solely as a form of contributory negligence to be compared against defendant's fault.[11] Setting express assumption of risk to one side, we limit the following analysis to implied assumption of risk. Under the merger of comparative negligence and implied assumption of risk, only reasonable implied assumption of risk remains as a potential bar

---

[11] *See, e.g.*, Florida: *Blackburn*, 348 So. 2d 287 (1977) (assumption of risk merged with comparative negligence; primary assumption of risk abolished); *West*, 336 So. 2d 80 (1976) (comparative negligence applicable to products liability cases). Texas: *Farley*, 529 S.W.2d 751 (1975) (implied assumption of risk merged with comparative negligence); *Duncan*, 665 S.W.2d 414 (pure comparative fault adopted in products liability case), *rev'd*, 665 S.W.2d 439 (1984). Alaska: *Leavitt v. Gillaspie*, 443 P.2d 61 (1968) (assumption of risk merged with contributory negligence); *Caterpillar Tractor Co. v. Beck*, 593 P.2d 871 (1979) (comparative fault applies to products liability); *Pepsi Cola Bottling Co.*, 427 P.2d 833 (1967) (comparative fault applies to implied warranty). *But see Milwaukee Elec. Tool Corp. v. Superior Court*, 6 Cal. Rptr. 2d 423 (Cal. App.), *opinion superseded by* 9 Cal. Rptr. 2d 358, 831 P.2d 798 (Cal.), *and review transferred to Court of Appeal by* 13 Cal. Rptr. 2d 849, 840 P.2d 954 (Cal. 1992).

to a plaintiff's recovery. Accordingly, if the concept of primary implied assumption of risk were retained by this court, it would bar recovery only where plaintiff's primary implied assumption was also reasonable.[12] The concept of reasonable primary implied assumption of risk makes sense in the products liability context under one set of circumstances—where plaintiff is injured while reasonably using a product that is *not defective*, e.g., plaintiff has reasonably assumed the risk of being cut while using an ordinary knife. However, as applied to a *defective* product, the concept is absurd; if a plaintiff is injured while reasonably using a defective product, a defendant should not be relieved of liability. Indeed, a defective product is one that causes injury when it is used in a reasonable manner, and the tort and implied warranty doctrines of products liability were designed to compensate plaintiffs for these very injuries. We therefore decline to retain the concept of reasonable primary implied assumption of risk where it unnecessarily duplicates the "defect" analysis and has the clear potential to generate confusion and error. To the extent that there may be unreasonable primary implied assumption of risk, we find that the policy it represents—the notion that no duty is owed—has been rendered invalid by the merger of comparative negligence and implied assumption of risk. *See Armstrong*, 69 Haw. at 182, 738 P.2d at 82–83. We consequently hold that in implied warranty and strict products liability tort

---

[12] Although there is some authority for the proposition that primary implied assumption of risk is synonymous with reasonable implied assumption of risk, other authorities are not clear on this point. *Compare Ordway v. Superior Court*, 198 Cal. App. 3d 98, 102, 105–07, 243 Cal. Rptr. 536, 538, 540–41 (1988), *with* RESTATEMENT (SECOND) OF TORTS § 496A comments c–d *and* KEETON, § 68, at 496–98.

actions, the concept of primary implied assumption of risk is abolished, and implied assumption of risk provides a defense to liability only when plaintiff's "assumption of risk" is a form of contributory negligence. *Cf.* RESTATE-MENT (SECOND) OF TORTS, *supra*, § 402A comment n at 356 (contributory negligence).

Having determined the applicable law, we now turn to Pacesetter's requested jury instructions. In the trial court, Pacesetter requested two instructions on assumption of risk. Instruction 54 described implied assumption of risk and instructed that assumption of risk differed from contributory negligence in that assumption of risk acted as a complete bar to plaintiff's recovery. Instruction 52 listed the elements of implied assumption of risk without distinguishing between primary and secondary implied assumption of risk. To the extent that Instruction 52 described primary implied assumption of risk, it was an incorrect statement of the applicable law. To the extent that they instructed that secondary implied assumption of risk acted as a complete bar to recovery, Instructions 52 and 54 also incorrectly stated the law. We conclude that the trial court properly refused Pacesetter's instructions on assumption of risk.

## I.  MENTAL DISTRESS

Pacesetter relies on our decision in *Rodrigues v. State*, 52 Haw. 156, 472 P.2d 509 (1970), to assert that a claim for mental distress exists only in a negligence action and not in an action for breach of implied warranty. Pacesetter argues that extending such recoveries to implied warranty actions would result in an unlimited extension of liability.

Courts have been reluctant to recognize an individual's interest in freedom from mental disturbance and have

imposed restrictions on these recoveries over and above those required to prove liability for other forms of personal injuries. KEETON, *supra*, § 54, at 359–60. Reasons for these restrictions include the concern that the difficulty of distinguishing between fraudulent, trivial, and serious injuries will result in unlimited liability, as well as the fear that mental distress recoveries will impose burdens on defendants disproportionate to their culpability. *Id.*; ***Rodrigues***, 52 Haw. at 169–72, 472 P.2d at 519; P. Joseph, *Dillon's Other Leg: The Extension of the Doctrine Which Permits Bystander Recovery for Emotional Trauma and Physical Injuries to Actions Based on Strict Liability in Tort*, 18 DUQ. L. REV. 1, 7–16 (1979). Among the devices utilized to limit liability and provide additional guarantees of the genuineness of plaintiffs' claims are the requirements that a plaintiff: (1) experience a "physical impact;" (2) exhibit physical symptoms of harm; or (3) be in the "zone of danger" created by the defendant's act. S. Mead, *Recovery for Psychic Harm in Strict Products Liability: Has the Interest in Psychic Equilibrium Come the Final Mile?*, 59 ST. JOHN'S L. REV. 457, 470–73 (1985).

Both physical injury rules have been criticized as inadequate methods of distinguishing between worthy and unworthy claims. *Id.* at 471–72. The impact rule has been repudiated by a majority of courts because of its absurd results and arbitrary nature. HARPER, JAMES & GRAY, THE LAW OF TORTS, *supra*, § 18.4, at 686–87. The zone of danger rule has been found inadequate to discern the genuineness of an injury where a plaintiff claims psychic harm caused by observing injury to a loved one. Mead, *supra*, at 473. In a landmark decision, ***Dillon v. Legg***, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912

(1968), the Supreme Court of California rejected the zone of danger rule and replaced it with a series of requirements designed to determine whether a bystander observing an accident would foreseeably suffer serious mental harm.

In *Rodrigues* this court went a step further than *Dillon*, establishing an independent duty to refrain from the negligent infliction of serious mental distress, utilizing ordinary negligence principles to limit recovery and declining formally to adopt the *Dillon* foreseeability requirements. **Rodrigues**, 52 Haw. at 174, 472 P.2d at 520–21. This court reasoned that the trial court and jury were equipped to determine the genuineness and sufficiency of a plaintiff's injury given the current sophistication of the medical profession as well as the standard of proof limiting mental distress recoveries. *Id.* at 172, 472 P.2d at 519–20. Under *Rodrigues*, a duty is owed only to those who would foreseeably suffer severe mental distress as a result of those risks or hazards whose likelihood made a defendant's conduct unreasonably dangerous. Further, mental distress is compensable only if a normally constituted reasonable person would experience serious distress, that is, distress that is not trivial and transient or "part and parcel of everyday life in a community . . . ." *Id.* at 172–73, 472 P.2d at 520.

Other jurisdictions have generally allowed recovery for mental distress in strict products liability actions despite differences between negligence and strict liability theories of recovery. *See, e.g.,* **Anderson v. Whittaker Corp.**, 894 F.2d 804 (6th Cir. 1990); **Obieli v. Campbell Soup Co.**, 623 F.2d 668 (10th Cir. 1980); **Mauro v. Owens–Corning Fiberglas Corp.**, 225 N.J. Super. 196, 542 A.2d 16 (1988), *aff'd*, 116 N.J. 126, 561 A.2d 257 (1989). The few jurisdictions that have refused to extend

mental distress recoveries to strict liability actions have done so by resorting to a formalistic distinction between negligence and strict liability via a narrow construction of the "physical harm" requirement of § 402A of the Restatement (Second) of Torts. *Woodill v. Parke Davis & Co.*, 58 Ill. App. 3d 349, 374 N.E.2d 683 (1978), *aff'd*, 79 Ill. 2d 26, 38, 402 N.E.2d 194, 200 (1980) (the court also stated that case law allowed a cause of action only for severe emotional distress caused by intentional conduct); *Croteau v. Olin Corp.*, 704 F. Supp. 318, *aff'd*, 884 F.2d 45 (1st Cir. 1989).

Further, in Iowa, where the law of products liability and mental distress is quite similar to that in Hawaii, the Iowa Supreme Court has allowed bystanders to recover for mental distress in actions for breach of implied warranty.[13] In *Walker v. Clark Equipment Co.*, 320 N.W.2d 561 (Iowa 1982), the court stated that it saw no qualitative difference, once liability is found, between recoveries under theories of negligence, strict liability, or warranty, and that a plaintiff should recover all damages cognizable under the law and supported by the evidence. *Id.* at 563.

Like Iowa, we do not believe that a reasonable line may be drawn between mental distress recoveries in implied warranty, strict products, and negligence actions. In *Rodrigues*, we established that genuine mental

---

[13] In Iowa, a seller's warranty extends to any person who may be reasonably expected to use, consume, or be affected by, and who is injured by the goods. *Walker v. Clark Equip. Co.*, 320 N.W.2d 561 (Iowa 1982). Iowa recognizes strict tort and breach of warranty products liability actions, and utilizes a comparative fault system with regard to these actions. Iowa Code Ann. § 668.1. In *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981), the Iowa Supreme Court relied on the California Supreme Court's decision in *Dillon* to recognize a bystander cause of action for emotional distress.

distress was a legally cognizable injury. 52 Haw. at 174, 472 P.2d at 520. Genuine mental distress thus falls within the terms of HRS § 490:2–318, which provides: "A seller's warranty whether express or implied extends to any person who may reasonably be expected to use, consume or be affected by the goods and who is injured by breach of the warranty."

Allowing a mental distress recovery in a products liability suit is justified by and comports with the policies validating strict products liability in the first place, among which are compensation of injured consumers, encouragement of the development of safe products, and imposition of the cost of injury on the party best able to bear and distribute that cost. The primary problem presented by extension of liability to the strict products context would be the effect of imposing unlimited liability on product sellers and manufacturers, and thus on the consuming public. However, we have already addressed general concerns regarding controlling and limiting liability for mental distress in *Rodrigues*. Finally, we note that a defendant may request remittitur following trial or on appeal if a plaintiff's recovery is excessive. ***Bartlett v. Hawaiian Carriage Mfg. Co.***, 13 Haw. 313 (1901). *Cf.* R. Miller, *The Scope of Liability for Negligent Infliction of Emotional Distress: Making "The Punishment Fit the Crime,"* U. HAW. L. REV. 1 (1979) (suggesting that damages recoverable for mental distress be limited to tangible economic loss).

Seeing no principled basis by which we may distinguish between physical and psychic injury proximately caused by defective products, or otherwise restrict mental distress recoveries in the products liability context, we conclude that plaintiff may recover damages for mental distress in an implied warranty action.

## J.   FUTURE PAIN AND SUFFERING

Pacesetter maintains that the law in Hawaii provides that future pain and suffering must be proven by competent expert opinion testimony.   Pacesetter argues that plaintiffs failed to introduce competent expert testimony to prove his claim of future pain and suffering and also urges that plaintiffs, at most, introduced enough evidence to show only past pain and suffering.

The question of future pain and suffering should not be submitted to the jury in the absence of evidence sufficient to show a reasonable probability that pain and suffering will in fact occur in the future.   *Bachran v. Morishige*, 52 Haw. 61, 68–69, 469 P.2d 808, 813 (1970).   The purpose of this rule is to avoid unwarranted imposition of liability due to guesswork and speculation on the part of the jury.   *Id.*   Contrary to Pacesetter's assertion, expert testimony is not always necessary to meet the standard of reasonable probability.   In *Franco v. Fujimoto*, 47 Haw. 408, 390 P.2d 740 (1964) (*overruled in part, on other grounds*, in *Barretto v. Akau*, 51 Haw. 383, 463 P.2d 917 (1969)), the court relied on the rule set out in 20 AM. JUR. *Evidence* § 778, at 649, to distinguish among the kinds of circumstances in which expert testimony would be necessary to prove future damages.   *Franco*, 47 Haw. at 432–33, 390 P.2d at 754.   Under the *Franco* rule, expert testimony is not necessary where an injury is objective in nature and it is plainly apparent from the injury itself that the harm is permanent or that the injured person will necessarily undergo pain and suffering in the future.   Expert testimony is necessary under *Franco* only where an injury is subjective in character and of such nature that a layperson cannot with reasonable certainty

know whether there will be future pain and suffering. *Id.* at 433, 390 P.2d at 754.

An objective injury manifests itself physically, in a form observable to persons other than the plaintiff. *Id.* at 432, 390 P.2d at 754 (scar was of an objective nature, whereas plaintiff's complaints of head, back, and shoulder pain were purely subjective). Courts have found expert testimony unnecessary and an injury objective in character where plaintiff has suffered loss of limbs, sensory organs, or has been crippled or seriously disfigured. *See, e.g.,* ***Burnett v. Caho***, 7 Ill. App. 3d 266, 285 N.E.2d 619 (1972) (plaintiff's lost right eye was objective disability).

We cannot characterize plaintiff's injury as objective in nature. In this case, plaintiff argued that he would experience future pain and suffering because of the thrombosis, or blood clot that was caused by the pacemaker leads that had been left in his heart. Plaintiff testified to symptoms of dizziness, full–headedness, reduction in his ability to think, confusion, and memory loss, and maintained that these symptoms would continue into the future. Plaintiff also claimed that there was a risk that additional clots would form or that the existing clot could dislodge, travel to his lungs, and cause death. Thus, the only "objective" component of plaintiff's injury was the clot, which could not be directly observed, and was diagnosed after plaintiff's physician observed its effect on other parts of plaintiff's body. Even if the jury were able to observe the clot, it would not be plainly apparent to a layperson that the injury would be permanent, that plaintiff would experience the symptoms he testified to, or that plaintiff's symptoms would continue into the future. We find that expert testimony was necessary to establish a reasonable probability of future pain and suffering.

Although the testimony of expert witnesses was necessary to establish future pain and suffering in this case, we do not address Pacesetter's claim that plaintiffs' witnesses were not competent to do so. Pacesetter's challenge falls under Rule 702 of the Hawaii Rules of Evidence (HRE) which provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify." HRE Rule 103 provides "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . a timely objection or motion to strike appears of record[.]" A timely objection functions to bring the matter complained of to the attention of the court for a timely ruling, to warn the adverse party, and to preserve the particular issue on appeal. 5 AM. JUR. 2D *Appeal and Error* § 553, at 37 (1962).

Pacesetter first raised the issue of the competence of plaintiff's witnesses, as well as the sufficiency of the evidence to establish a reasonable probability of future pain and suffering, in its Motion for Judgment Notwithstanding the Verdict or Alternatively, Motion for New Trial. Pacesetter failed to object to the qualifications of these witnesses at trial. In failing to object to the witnesses' competence at trial, Pacesetter deprived the court of any opportunity to cure the alleged error and waived the right to raise the question on appeal.

In any event, upon examination of the record, we conclude that there was sufficient evidence upon which the jury could conclude with reasonable probability that plaintiff would experience pain and suffering in the future. First, although the jury could not observe the clot themselves, there was testimony by plaintiff's physician describing the evidence he had examined in order to conclude that a clot was present. Plaintiff's physician also testified that the clot continued to exist at the time of the

trial and could not be destroyed or removed. Second, there was testimony linking plaintiff's symptoms to the presence of the clot. Dr. Gilbert, who first diagnosed plaintiff's clot, reported that plaintiff had symptoms of fullness of the head, lightheadedness, and severe headaches three years after the clot formed. He attributed these symptoms, as well as plaintiff's symptoms at the time of trial, to the clot. Third, there was testimony that the clot not only continued to exist, but also posed a risk of additional complications that might themselves cause plaintiff pain and suffering. Dr. Gilbert testified that "due to the sluggish currents of blood around [the clot] . . . that we still have two possibilities. One is getting another clot, and the second is . . . an infection." He also testified that there was a decreasing risk that the clot would break off and travel into the lungs, a serious condition which could be fatal to plaintiff. Another of plaintiff's physicians, testifying that the primary cause of plaintiff's symptoms of dizziness and fatigue was the thrombosed vein in plaintiff's chest, stated that plaintiff would continue to require a high level of medical care in the future to treat this condition. Consequently, the trial court correctly submitted the question of future pain and suffering to the jury.

### K.  POSTJUDGMENT INTEREST ON PREJUDGMENT INTEREST

The trial court granted plaintiffs prejudgment interest from August 11, 1987, one month prior to the date on which plaintiffs filed their complaint in this case. After the jury returned its verdict, the court calculated prejudgment interest that had accrued to the date of that verdict, September 13, 1990. The court then imposed postjudgment interest at 10% per annum on total prejudgment interest as well as on the jury's award of damages.

Pacesetter asserts that the award of postjudgment interest on prejudgment interest violates HRS § 478–3 (Supp. 1991).

The general rule is that interest on damages is not recoverable in a tort action unless specifically authorized by statute. *Chapman v. Hawaiian Gov't*, 8 Haw. 653, 656 (1887); McCormick, *The Law of Damages* § 51 (1985); see *Coleman v. Reamer's Ex'r*, 237 Ky. 603, 36 S.W.2d 22 (1931) (interest was usury, a punishable offense). The controlling statute is HRS § 478–3, which provides that: "[i]nterest at the rate of ten per cent a year, and no more, shall be allowed on any judgment recovered before any court in the State, in any civil suit."

We agree with Pacesetter that when the trial court calculated prejudgment interest and imposed additional postjudgment interest of 10% on that interest, it in effect, contravened the express terms of § 478–3. However, plaintiffs argue that the court had authority to make this award under HRS § 636–16 (1985), as well as our decision in *Lucas v. Liggett & Myers Tobacco Co.*, 51 Haw. 346, 461 P.2d 140 (1969), because the award compensated plaintiffs for the interest they would have been able to collect if they had invested their interest on the judgment.

In *Lucas*, this court interpreted § 478–3 (then HRS § 478–2) as authorizing a court to award interest commencing prior to the time of judgment. We reasoned that an award of interest "from the date of conversion of [the plaintiff's] property by a defendant until the date judgment is satisfied[]" was proper under the statute because it would recompense plaintiff for losses caused by defendant's conversion, thus effectuating the compensatory purpose of an award of interest. *Id.* at 348, 461 P.2d at 143 (1969). In 1979, the legislature expressly affirmed

our interpretation of § 478–2 by enacting HRS § 636–16 which provides:

> In awarding interest in civil cases, the judge is authorized to designate the commencement date to conform with the circumstances of each case, provided that the earliest commencement date in cases arising in tort, may be the date when the injury first occurred and in cases arising by breach of contract, it may be the date when the breach first occurred.

The legislative history of § 636–16 restated our reasoning in *Lucas*:

> Your Committee understands that at the present time interest is generally awarded commencing on the day the judgment is rendered. Where the issuance of a judgment is greatly delayed for any reason, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results. Also, it is expected that party litigants will give serious regard to this discretion on the part of the trial judge so that those who may have had an unfair leverage by the arbitrariness of the prior rule will arrive at the realization that recalcitrance or unwarranted delays in cases which should be more speedily resolved will not enhance their position or assure them of a favorable award.

Sen. Conf. Comm. Rep. No. 67, in 1979 Senate Journal, at 984.

We find no direct support in *Lucas* and § 636–16 for treating prejudgment interest as a separate award at the time of judgment, on the basis of which postjudgment

interest may be imposed. Although both *Lucas* and § 636–16 provide authority for a court to set the starting date for an award of interest at a time prior to the judg- ment, *Lucas* plainly states that interest beginning at a date prior to judgment will continue past judgment until plaintiff's claim is *satisfied.* We read § 636–16 as consistent with *Lucas* in this regard.

We reject plaintiffs' attempt to harmonize interest on interest with our reasoning in *Lucas* and § 636–16, by characterizing it as compensatory. *Lucas* is limited by § 478–3. The express terms of the statute authorize interest on the "judgment." They contain nothing that would authorize a court to impose § 478–3 interest on § 636–16 interest. Therefore, although it is true that plaintiffs could have invested the interest on the judgment and thereby profited, § 478–3 does not protect any right that plaintiffs may have to those profits. Postjudgment interest on prejudgment interest is a windfall to plaintiff under § 478–3, and, as such, is more punitive than compensatory under *Lucas. Cf. State v. Pioneer Mill Co.,* 64 Haw. 168, 184–85, 637 P.2d 1131, 1142 (1981) (postjudgment interest on blight of summons damages is interest on interest and § 101–33 contains no authority for the award).

The trial court's award of postjudgment interest on prejudgment interest is reversed.

## L. ATTORNEY'S FEES

Having determined that plaintiffs were not entitled to postjudgment interest on prejudgment interest, we turn to plaintiffs' claim that attorney's fees should have been awarded because their implied warranty claim was an action "in the nature of assumpsit."

The rule in this country is that in the absence of contract or statute a litigant has no inherent right to have his attorney's fees paid by his opponent. S. SPEISER, *Attorney's Fees* § 12:3, at 464–466 n.26 (1973); McCOR-MICK, *supra*, § 60, at 234; RESTATEMENT (SECOND) OF TORTS, *supra*, § 914(1) comment a; *see generally* Annotation, *Attorney's Fees in Products Liability Suits*, 53 A.L.R 4TH 414 (1987). Thus, the question is whether plaintiffs are correct in claiming that their action falls within HRS § 607–14 (1985). The statute provides that "in all actions in the nature of assumpsit" the court shall tax the losing party with reasonable attorney's fees not to exceed amounts set forth in the statute. The original 1872 statute was also limited to assumpsit actions, and despite the merger of all forms of action into one "civil action" the statute continues to require that actions be "in the nature of assumpsit." *Schulz v. Honsador, Inc.*, 67 Haw. 433, 435, 690 P.2d 279, 281–82 (1984) (citing Act 29, § 5, 1872 Haw. Sess. Laws 25, 26; Act 88, § 5(q), 1972 Haw. Sess. Laws 325, 337).

This court has found that when the tortious or contractual nature of the action is in question, plaintiff's complaint, declaration, or petition should be examined. *Schulz*, 67 Haw. at 436, 690 P.2d 282 (citing *Au v. Au*, 63 Haw. 210, 626 P.2d 173 (1981); 63 AM. JUR. 2D *Products Liability* § 906 (1984)); *Osorio v. Henry Waterhouse Trust Co.*, 29 Haw. 376, 382 (1926). The character of the action should be determined from the facts and issues raised in the complaint, *Schulz*, 67 Haw. at 436, 690 P.2d at 282, and an important factor is the remedy prayed for. *Osorio*, 29 Haw. at 391. The manner in which plaintiff has characterized the action may also be accorded some weight. *Osorio*, 29 Haw. at 386.

In this case, the issue is whether the trial court correctly found that plaintiffs' action sounds in tort rather than in assumpsit. Black's Law Dictionary states that the term "assumpsit" is a Latin term meaning "[h]e undertook; he promised." The dictionary defines the term in various ways, all of which have some relationship to a promise or engagement. The term "tort" is defined as a "legal wrong committed upon the person or property independent of contract," and the dictionary states that "[t]here must always be a violation of some duty owing to plaintiff, and generally such duty must arise by operation of law and not by mere agreement of the parties."

Plaintiffs do not specifically characterize the various claims in their complaint. Examination of plaintiffs' claims reveal that the contractual elements of plaintiffs' complaint are not expressly pleaded as such. An actual contract between the parties is not alleged. Plaintiffs assert that Pacesetter represented that the pacemaker was safe for its intended purpose by placing the product on the market. Further, plaintiffs do not elaborate on the promissory aspects of their claim. They do not plead breach of contract, but rather, that they did not know that the product was unsafe.

However, when plaintiffs' allegations of injury are examined, their claims sound entirely in tort. Plaintiffs do not complain of the kinds of economic losses that would result when the expectations of a party to a contract are frustrated. They allege damages which include physical injuries, disability, pain, loss of earnings, medical expenses, and loss of consortium. Therefore, plaintiffs claim injuries that have traditionally been protected, not by an exchange of promises, but by an independent duty imposed by law. We consequently hold that the trial court

correctly denied plaintiffs recovery of attorney's fees under HRS § 607–14.

## III.

We vacate the trial court's award of postjudgment interest on prejudgment interest and remand for proceedings consistent with this opinion. In all other respects, the judgment is affirmed.

*Martin Anderson* (*Mark B. Desmarais* and *Mark E. Recktenwald* with him on the briefs of Goodsill, Anderson, Quinn & Stifel) for plaintiffs–appellees, cross–appellants David W. Larsen and Shirley Larsen.

*Ronald G. Rolnick* (*Nelson S.W. Chang* on the briefs of Bybee, Chang & Rulon of Honolulu) of Sandler, Rolnick & Morse of California, for defendant–appellant, cross–appellee Pacesetter Systems, Inc.