PATRICIA WAGATSUMA, for herself, and as Special Administrator for the ESTATE OF WAYNE ROBERT WAGATSUMA, Plaintiff–Appellant, v. WALLACE PATCH, LINDA PENN, Defendants, and DOUGHBOY RECREATIONAL, INC., a division of HOFFINGER INDUSTRIES, INC., Defendant–Appellee

WALLACE PATCH, Third–Party Plaintiff/Counterdefendant, v. KELLY JONES and PATRICIA WAGATSUMA, Third–Party Defendants, and WAYNE WAGATSUMA, Third–Party Defendant/ Counterclaimant

WALLACE PATCH, Cross–claimant, v. DOUGHBOY RECREATIONAL, a division of HOFFINGER INDUSTRIES, INC., Cross–defendant

DOUGHBOY RECREATIONAL, a division of HOFFINGER INDUSTRIES, INC., Counterclaimant/ Cross–claimant, v. PATRICIA WAGATSUMA, Counterdefendant, and WALLACE PATCH, LINDA PENN, KELLY JONES and WAYNE WAGATSUMA, Cross–defendants

WAYNE WAGATSUMA, Counterclaimant, v. DOUGH-BOY RECREATIONAL, a division of HOFFINGER INDUSTRIES, INC., Counterdefendant

NO. 16037

(CIV. NO. 90–051)

AUGUST 26, 1994

BURNS, C.J., HEEN, AND WATANABE, JJ.

550

554

OPINION OF THE COURT BY HEEN, J.

We vacate the March 23, 1992 summary judgment (Judgment) entered by the circuit court in favor of Defendants–Appellees Doughboy Recreational, Inc., and

Hoffinger Industries, Inc. (collectively Defendant),[1] dismissing all of Plaintiff–Appellant Patricia Wagatsuma's (Plaintiff) negligence, strict products liability, and emotional distress claims against Defendant and remand this matter for further proceedings.

## I. FACTS

This action arose from the drowning of Plaintiff's four–year–old son Wayne Robert (Wayne) on February 8, 1988, in a swimming pool (pool) manufactured by Defendant. On that date, Plaintiff left Wayne and Plaintiff's two other minor children, Kelly Jones (Kelly), 12, and Sandy, 20 months, at the residence of co–defendants Linda Penn (Penn) and Wallace Patch (Patch) in Pahoa, Hawai'i, while Plaintiff went on an errand.[2] Sometime after Plaintiff left, Penn and Kelly discovered Wayne's lifeless body floating face down in the pool which was attached to the residence. An autopsy confirmed that Wayne had drowned.

Patch, who was the owner of the premises and Penn's landlord, purchased the pool in California in 1979 from one of Defendant's distributors, brought the pool to Hawai'i, and installed it on the property. The above ground pool was approximately four feet deep and was surrounded at its top by a wooden deck which connected the pool to the house. The deck, in turn, was partly sur-

---

[1] The amended complaint and the caption identify Doughboy Recreational, Inc. (Doughboy), as a separate corporate defendant. However, in its answer, Defendant–Appellee Hoffinger Industries, Inc. (Hoffinger), avers that Doughboy is merely one of Hoffinger's divisions. The judgment is in favor of both Doughboy and Hoffinger.

[2] Plaintiff and co–defendant Linda Penn (Penn) disagree whether the two younger children were left in Kelly Jones' care, or whether Plaintiff had hired Penn to care for all three children.

rounded by a fence with a gate that prevented access to the pool from the ground. However, there was no fence or gate between the pool area and the residence. Thus, the pool was directly accessible from the residence by crossing over the deck.

On February 2, 1990, Plaintiff, for herself and as administrator of Wayne's estate, filed the original complaint against Patch and Penn alleging that their negligence had caused Wayne's death.

On September 11, 1990, Plaintiff filed an amended complaint to include claims against Defendant. In Count I of the amended complaint, Plaintiff alleged that Defendant was negligent because it "failed to use good engineering practices in designing, constructing and marketing" the pool. Specifically, Plaintiff alleged that Defendant was negligent because Defendant (1) did not include in its sales package to Patch an "aquatic safety system" that included, *inter alia,* "safety fencing, a safety ladder, a pool alarm and a safety pool cover," for use on the pool, (2) did not provide Patch with any "aquatic safety documents concerning, inter alia [sic], adequate fencing, self–closing and positive self–latching gates, house latching and locking mechanisms, pool alarms and safety pool covers[,]" either at the time of the sale or at any time before Wayne's death.[3] Count II, Plaintiff's claim for products liability, alleged that the "pool was in a defective condition unreasonably dangerous to the user" because of the design and manufacturing defects and the "fail[ure] to warn the user about the dangers incident to the intended or foreseeable

---

[3] Count I of the amended complaint also alleged that co–defendant Wallace Patch (Patch) was negligent in failing to provide such safety devices and that Penn did not properly supervise the children.

use of the swimming pool[.]" In Count III, Plaintiff alleged that Defendant's negligence caused her "severe emotional distress[.]"

On January 17, 1992, Defendant filed a motion for summary judgment (Motion) on Plaintiff's claims. In support of the Motion, Defendant filed excerpts from depositions taken of Patch, Penn, Plaintiff, and Kelly, as well as excerpts from Plaintiff's responses to Defendant's interrogatories. Defendant's evidence indicates that, although Patch always had a fence and gate to prevent access to the pool from the ground, he chose not to install a gate limiting access to the pool from the residence. Additionally, Plaintiff's deposition testimony indicates that Plaintiff, a former lifeguard and swimming instructor, had been teaching Wayne to swim but that he could not yet do so. Penn's and Kelly's depositions indicate that neither of them saw Wayne enter the pool or knew how he died.

In opposing the Motion, Plaintiff submitted affidavits from George F. Lawniczak, Jr., Ph.D. (Dr. Lawniczak), David S. Smith, Ph.D. (Dr. Smith), and Philip L. Carey (Carey), Plaintiff's counsel. Dr. Lawniczak's resume, attached to the affidavit, establishes his rather extensive experience in "aquatic safety." Dr. Lawniczak also attached excerpts and articles from a number of trade journals and other publications, and from the national safety council, dealing with swimming pools and drownings. Some of the attachments contain statistical data and other information on the incidence of children drowning in swimming pools. The essence of Dr. Lawniczak's affidavit is that the statistics and data indicate that all swimming pools should be equipped with safety devices to prevent such drownings. Dr. Lawniczak opines that if

Patch's pool had been so equipped, Wayne might not have drowned.

Dr. Smith's affidavit similarly asserts that he is an aquatic safety expert. Dr. Smith avers that, based on his knowledge of the subject of drownings, special care must be taken to protect children from drowning in swimming pools. Dr. Smith advocates constant supervision of children around swimming pools and instruction for all pool owners on pool safety. Dr. Smith also states that information on safety devices should have been provided to Patch and that if the devices had been installed, Wayne's death could have been prevented.

Carey's affidavit submitted numerous documents, including (1) depositions of Plaintiff, Penn, and Dr. Lawniczak in this case; (2) depositions of certain of Defendant's officers and employees from an unrelated drowning suit against Defendant in Alabama; and (3) portions of Defendant's responses to interrogatories in the Alabama case.

Before the hearing on the Motion, Plaintiff filed an affidavit from Patch in which Patch averred that when he bought the pool from Defendant's distributor in Santa Cruz, California, he was not provided with any safety equipment or safety system; he was not informed that such equipment was available; he was aware of some kinds of safety equipment; he did not recall that Defendant supplied him with any literature relating to the safe operation of the pool with regard to children; and he did not receive any information or warnings about safety from Defendant after he bought the pool.

Plaintiff's evidence indicates that (1) the incidence of child drownings in swimming pools was well known; (2) pool safety devices were available at the time Patch

bought the pool from Defendant; (3) Defendant knew about such devices but neither offered them to Patch nor informed him of their availability; and (4) Plaintiff's experts were of the opinion that if such devices had been installed on the pool, Wayne's death could have been prevented.

The briefs engage in a lengthy discussion of the admissibility of Plaintiff's experts' affidavits and attached supporting materials. Defendant argues that, since the supporting materials are inadmissible hearsay, the expert opinions are unfounded. Defendant also contends that the depositions from the Alabama case are not properly certified or sworn to as required by Hawai'i Rules of Civil Procedure (HRCP) Rule 56(e) (1990). Consequently, Defendant contends that Plaintiff's evidence fails to establish any genuine issue of material fact. In our view of the case, the debate is irrelevant. It is generally held that "[t]he question of negligence or the standard of reasonable care is one within the jury's competence and opinion testimony on this subject is generally excluded." *Sherry v. Asing*, 56 Haw. 135, 147–48, 531 P.2d 648, 657 (1975).

As the following discussion will show, expert testimony was not needed to establish genuine issues of material fact. *See **Brown v. Clark Equipment Co.**,* 62 Haw. 530, 618 P.2d 267 (1980) (expert testimony unnecessary where the issues are within the common knowledge of the jurors). [4]

---

[4] The majority of jurisdictions allow expert affidavits at summary judgment; however, the courts disagree over what requirements the proponent of such affidavits must satisfy. See E. Brunet, *The Use and Misuse of Expert Testimony in Summary Judgment*, 22 U.C. DAVIS L. REV. 93 (1988) (Brunet).

After a hearing, the court granted the Motion and entered the Judgment, which was properly certified as final for appeal purposes in accordance with HRCP Rule 54(b) (1980). [5] Plaintiff thereafter timely appealed.

---

The United States Supreme Court has not disapproved the use of expert affidavits in summary judgment cases. *Edwards v. Aquillard*, 482 U.S. 578, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987); *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S. Ct. 724, 88 L. Ed. 967 (1944), while other federal courts have split on the question.

Some federal cases have rejected expert affidavits on the grounds that they do not meet the requirements of Federal Rules of Civil Procedure Rule 56(e) (1994). *See, e.g., United States v. Various Slot Machines on Guam*, 658 F.2d 697 (9th Cir. 1981); *Mapco, Inc. v. Carter*, 573 F.2d 1268 (Temp. Emer. Ct. App.), *cert. denied*, 473 U.S. 904, 98 S. Ct. 3090, 57 L. Ed. 2d 1134 (1978); *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666 (D.C. Cir. 1977). Other federal courts have admitted such affidavits if they satisfy the standards set by the Federal Rules of Evidence. *See, e.g., Monks v. General Elec. Co.*, 919 F.2d 1189 (6th Cir. 1990); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315 (9th Cir. 1985).

Professor Brunet notes that

At first glance, the increasing use of expert testimony in the summary judgment process seems illogical and impossible. After all, summary judgments are only proper when no factual disputes exist, and the stock–in–trade of the expert witness is venturing opinions on issues of fact. The very presence of an expert implies that issues of fact exist.

Brunet, at 93 (footnotes omitted).

Professor Brunet also notes that the cases allowing the use of expert affidavits on summary judgment motions "show that policies deriving from the law of evidence merit consideration in deciding the appropriate role of the expert affidavit[,]" and that, "[t]he clear modern evidentiary trend is to encourage the use of expert testimony." *Id.* at 110.

[5] Penn's *pro se* answer to the complaint denies liability; Patch answered and filed a counterclaim against Plaintiff alleging that her negligence caused Wayne's death. Patch thereafter filed a cross–claim against Penn and a third–party claim against Kelly, Wayne, and Plaintiff, alleging that they were responsible for Wayne's death. Plaintiff

## II. STANDARD OF REVIEW

At the outset, we emphasize that our decision in this case is strictly limited to the question of whether summary judgment was properly granted. The standard of review is whether the record shows that no genuine issue of material fact exists as to any element or elements of Plaintiff's negligence and strict liability claims and Defendant is entitled to judgment in its favor as a matter of law. *Beamer v. Nishiki*, 66 Haw. 572, 670 P.2d 1264 (1983).

The movant in a summary judgment proceeding has the burden of showing the absence of any material fact issue, *First Hawaiian Bank v. Weeks*, 70 Haw. 392, 772 P.2d 1187 (1989), and the movant may discharge that burden by showing that if the case went to trial there would be no evidence to support the non–movant's position. *Id.* The evidence and the reasonable inferences therefrom must be viewed in the light most favorable to the non–moving party, *Bidar v. AMFAC, Inc.*, 66 Haw. 547, 669 P.2d 154 (1983), and summary judgment will be denied where the movant's proof supplies evidence showing a genuine issue of material fact, *see Dalke v. Upjohn Co.*, 555 F.2d 245 (9th Cir. 1977), even if the opposing party has presented no opposing evidence. The general rule is that "[w]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied *even if no opposing evidentiary matter is presented*." 10A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE:

---

and Patch subsequently entered a stipulation by which the complaint against Patch and Patch's counterclaim, cross–claims, and third–party complaints were dismissed with prejudice. However, Plaintiff's claim against Penn is still pending.

*Civil* § 2739, at 524 (1983) (Wright ·& Miller) (quoting Advisory Committee on Civil Rules Note to the 1963 amendments to Rule 56) (emphasis in Wright & Miller).

Summary judgment must be used with due regard for its purpose and should be cautiously invoked so that no person will be improperly deprived of a trial of disputed factual issues. *Miller v. Manuel*, 9 Haw. App. 56, 828 P.2d 286 (1991), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1992). As a general rule, questions of negligence are ordinarily not susceptible to summary judgment. *McKeague v. Talbert*, 3 Haw. App. 646, 658 P.2d 898 (1983).

Summary judgment is analogous to a directed verdict, *id.*, and where the evidence proffered in support of a motion for summary judgment and the inferences fairly to be drawn from them are reasonably susceptible of differing interpretations, summary judgment should not be granted. *Kawaihae v. Hawaiian Ins. Cos.*, 1 Haw. App. 355, 619 P.2d 1086 (1980).

After a thorough review of the record, we conclude that genuine issues of material fact exist as to Plaintiff's claims and summary judgment was improvidently granted.

## III. PARTIES' CONTENTIONS

Plaintiff argues that (1) there is a genuine issue of material fact as to whether Defendant was negligent in not including one or more of the following items in the pool sales package: (a) labels warning pool users that the pool posed a particular and unique danger for young, unsupervised children; (b) an "aquatic safety system" including, *inter alia*, one or more of the following: (i) warning labels, (ii) safety fencing, (iii) a self–locking, child–proof gate, (iv) a pool cover, (v) a pool alarm system, (vi) a safety ladder; *or*

(vii) printed material informing pool purchasers of the availability of such aquatic safety systems; and (2) the absence of such safety items rendered the pool dangerously defective. Essentially, Plaintiff asserts that Defendant was negligent in designing, manufacturing, and marketing the pool without any devices reasonably designed to prevent young children from falling into the pool.

Defendant's argument implicitly concedes that swimming pools are dangerous to improperly supervised young children. However, Defendant contends that (1) the danger is so commonly known that it had no duty to provide labels warning of the hazard of allowing unattended or unsupervised young children in the vicinity of a swimming pool; (2) it had no duty to provide its customers with safety equipment or devices to prevent unattended young children from falling into its swimming pool, or provide them with information of the availability of those devices, because it was not reasonably foreseeable that a parent or other custodian would leave a young child unsupervised in the area of a swimming pool; (3) Plaintiff failed to produce any proof that the pool was "dangerously defective"; and (4) Plaintiff's negligence was the sole legal cause of Wayne's death.

## IV. PRINCIPLES OF PRODUCTS LIABILITY

A party who asserts that his or her injuries were caused by a defective product may proceed against the alleged tortfeasor under principles of negligence and/or strict liability. *Ontai v. Straub Clinic and Hospital*, 66 Haw. 237, 659 P.2d 734 (1983); *Brown v. Clark Equipment Co.*, 62 Haw. 530, 618 P.2d 267 (1980); 2 AMERICAN LAW OF PRODUCTS LIABILITY, § 28:5 (1987) (hereinafter 2 ALPL).

A product may be defective "under any one of three general theories: defective manufacture, defective design, or insufficient warning." Note, *Unreasonably Dangerous Products From A Child's Perspective: A Proposal For A Reasonable Child Consumer Expectation Test*, 20 RUTGERS L.J. 433, 436 (1989) (footnotes omitted). Unlike a claim that a product was defectively manufactured, a product that is claimed to be dangerous because of a design defect cannot be measured against a standard set by the manufacturer.[6] *O'Brien v. Muskin*, 94 N.J. 169, 181, 463 A.2d 298, 304 (1983). The failure of a manufacturer to equip its product with a safety device may constitute a design defect. *Ontai*.

Generally, a products liability claim based on either negligence or strict liability has three elements: (1) a duty to anticipate and design against reasonably foreseeable hazards; (2) breach of that duty; and (3) injury proximately caused by the breach. 2 ALPL § 28:33, at 47. In negligence, the plaintiff must show that the defendant breached its duty of care, while in strict liability the plaintiff must show that the product was defective because it was unreasonably dangerous. *Anguiano v. E. I. DuPont de Nemours and Co.*, 808 F. Supp. 719, 722 (D. Ariz. 1992).

> Negligence theory concerns itself with determining whether the conduct of the defendant was reasonable in view of the foreseeable risk of injury;

---

[6] A manufacturing "defect occurs when, at the manufacturing stage, the product does not conform to the quality of other products of its kind." Note, *Unreasonably Dangerous Products From A Child's Perspective: A Proposal For A Reasonable Child Consumer Expectation Test*, 20 RUTGERS L.J. 433, 436 n.15 (1989).

strict liability is concerned with whether the product itself was unreasonably dangerous.

2 ALPL, § 28:16, at 31 (1987) (footnotes omitted).

## A. Negligence Liability

The plaintiff's burden in a negligent design claim is to prove that the manufacturer was negligent in not taking reasonable measures in designing its product to protect against a foreseeable risk of injury, *see Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 709 P.2d 876 (1985), and the manufacturer's negligence was a proximate cause of the plaintiff's injury. *Ono v. Applegate*, 62 Haw. 131, 612 P.2d 533 (1980). Negligence can result from a failure to act as well as from an affirmative act, *Quality Furniture, Inc. v. Hay*, 61 Haw. 89, 595 P.2d 1066 (1979), and causation may be proved by circumstantial evidence. *American Broadcasting Cos. v. Kenai Air of Hawaii [Hawai'i]*, 67 Haw. 219, 686 P.2d 1 (1984).

Among the factors the fact finder should consider in determining whether the manufacturer acted reasonably are: (1) balancing the likelihood and gravity of the potential harm against the burden of precautions which would effectively avoid the harm; (2) the style, type, and particular purpose of the product; (3) the cost of an alternative design, since the product's marketability may be adversely affected by a cost factor that greatly outweighs the added safety of the product; and (4) the price of the product itself. 2 ALPL, § 28:33, at 47.

## B. Strict Liability

The doctrine of strict liability has eased the plaintiff's burden of proof in a design defect case by eliminating the requirement that the plaintiff prove the manufacturer's

negligence.[7] **O'Brien**, 94 N.J. at 178–79, 463 A.2d at 303 (citing Keeton, *Product Liability and the Meaning of Defect*, 5 ST. MARY'S L.J. 30, 34–35 (1973)). The plaintiff's burden in such a case is to prove (1) a defect in the product which rendered it unreasonably dangerous for its intended or reasonably foreseeable use; and (2) a causal connection between the defect and plaintiff's injuries. *Ontai*, 66 Haw. at 243, 659 P.2d at 740. Proof of defect and causation may be provided by expert testimony or by circumstantial evidence. *American Broadcasting Cos.*

*Ontai* establishes two alternative tests to ascertain whether a product is defective: the consumer expectation test and the risk–utility test. Under the consumer expectation test, the plaintiff must show that the product failed to perform as safely as an ordinary consumer would expect when it was used in its intended or reasonably foreseeable manner. On the other hand, the risk–utility test requires that once the plaintiff proves that the product's design caused the injury complained of, the defendant must prove that the benefits of the design outweigh the risk of danger inherent in that design.[8] *Ontai*, 66 Haw. at 242, 659 P.2d at 739–40.

Under the risk–utility test, the fact finder balances a number of relevant factors, which are listed in **Larsen v.**

---

[7] Some of the policy considerations underlying the strict liability doctrine are (1) that "a consumer is 'entitled' to assume that a product is intended for its ordinary use and thus, the consumer should recover if harm results[;]" (2) the hope that the manufacturer will produce safer products; and (3) the manufacturer can distribute the cost of compensating the injured consumer among all consumers. *Id.* at 435.

[8] Citing **Vincer v. Esther Williams All–Aluminum Swimming Pool Co.**, 69 Wis. 2d 326, 230 N.W.2d 794 (1975), Defendant further argues that the "pool was not defective since it met the reasonable

*Pacesetter Systems, Inc.*, 74 Haw. 1, 23 n.6, 837 P.2d 1273, 1285 n.6 (1992).[9]

The procedure in applying the risk–utility test is best described in ***Barker v. Lull Eng'g Co.***, 20 Cal. 3d 413, 143 Cal. Rptr. 225, 573 P.2d 443 (1978), cited with approval by the *Ontai* court.

> [O]nce the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately

---

expectations of the ordinary consumer or user." *Vincer* is inapposite because the case was decided on the basis of the reasonable consumer expectation test for defectiveness and did not involve the alternative risk–utility test.

[9] The factors are as follows:

(1) The usefulness and desirability of the product—its utility to the user and to the public as a whole.

(2) The safety aspects of the product — the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 23 n.6, 837 P.2d 1273, 1285 n.6 (1992) (quoting J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825, 837–38 (1973); footnote omitted in *Larsen*).

shift to the defendant to prove, in light of the relevant factors, that the product is not defective. Moreover, inasmuch as this conclusion flows from our determination that the fundamental public policies embraced in *Greenman [v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963)][10] dictate that a manufacturer who seeks to escape liability for an injury proximately caused by its product's design on a risk–benefit theory should bear the burden of persuading the trier of fact that its product should not be judged defective, the defendant's burden is one affecting the burden of proof, rather than simply the burden of producing evidence.

*Barker*, 20 Cal. 3d at 431–32, 143 Cal. Rptr. at 237, 573 P.2d at 455 (footnote added). [11] *Accord Campbell v. General Motors Corp.*, 32 Cal. 3d 112, 184 Cal. Rptr. 891, 649 P.2d 224 (1982).

---

[10] In *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 470 P.2d 240 (1970), our supreme court adopted the policies underlying strict product liability established in *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1963).

[11] In *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 430, 143 Cal. Rptr. 225, 236, 573 P.2d 443, 454 (1978), the Supreme Court of California stated:

> [A] product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies "excessive preventable danger," or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design.

The principles enunciated in *Barker* were adopted by our supreme court in *Ontai v. Straub Clinic and Hospital*, 66 Haw. 237, 243, 659 P.2d 734, 740 (1983).

We will now examine the record in this case in light of the foregoing principles.

## V. DUTY

Since, as we have noted, Defendant contends that it had no duty to Plaintiff to warn Plaintiff of the dangers inherent in the pool or to provide safeguards against injury to young children from the use of the pool, we must first determine whether Defendant had any duty to Wayne. If Defendant had no duty, it cannot be held liable under either negligence or strict liability.

Whether a duty exists,

> that is, "whether . . . such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other — or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant," *is entirely a question of law.*

*Bidar*, 66 Haw. at 552, 669 P.2d at 158 (quoting W. Prosser, *Handbook of the Law of Torts* § 37, at 206 (4th ed. 1971)) (emphasis added).

Additionally,

> [t]he legal duty of manufacturers . . . to exercise reasonable care in the design and incorporation of safety features to protect against foreseeable dangers is well established.

*Ontai*, 66 Haw. at 247, 659 P.2d at 734.

However, a manufacturer's duty of care to protect against injury from the use of its product extends only to

> those "who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the [manufac-

turer's] conduct unreasonably dangerous."
*Foreseeability is a question of law that this court
can competently determine.*

**Hulsman v. Hemmeter Dev. Corp.**, 65 Haw. 58, 68,
647 P.2d 713, 720–21 (1982) (citations omitted; emphasis
added).

Since it is obvious to all that swimming pools are
dangerous to young children, we take judicial notice of
that fact. Rule 201, Hawai'i Rules of Evidence, Hawai'i
Revised Statutes (HRS) Chapter 626 (1985).

Because of the obvious danger, it is unreasonable to
require that Defendant furnish labels with its pools warn-
ing of that danger. The manufacturer's duty to warn only
extends to known dangers which the user of the manufac-
turer's product would not ordinarily discover. *Ontai*, 66
Haw. at 248, 659 P.2d at 743.

However, we do not agree that the obvious danger
entirely relieves Defendant of any duty to reasonably pro-
tect against such injury, as a matter of law.

> The obviousness of the danger, unless it justifies
> the conclusion that the condition is not unreason-
> ably dangerous, has been held not to preclude
> liability on the part of a manufacturer who negli-
> gently designs a machine. The obviousness of
> peril is relevant to the manufacturer's defenses
> (e.g. contributory negligence), and not to the issue
> of duty. The creation of any unreasonable danger
> is enough to establish negligence, even though the
> danger is obvious. *And it is ordinarily a question
> for the jury as to whether or not a failure to install
> a safety device creates an unreasonable risk.*

**Brown**, 62 Haw. 530, 541, 618 P.2d 267, 273 (citations
omitted; emphasis added).

Defendant further argues, however, that it was not reasonably foreseeable that Plaintiff would allow Wayne to be in the vicinity of the pool without proper supervision. We disagree.

While it may be correct, as Defendant asserts, that consumers are expected to conduct their affairs with care and caution, it must be recognized that the expectation is not always realized. The consumers' attentiveness is very often undermined by human frailties, and their care and attention is not always exercised on a consistently high plane. Rather, their attentiveness is subject to ebbs and flows. Indeed, the unevenness of care is perhaps nowhere more evident than with respect to parental attention to their children's safety and welfare. Even the most cautious parents suffer lapses of attention and are distracted from the watchful care of their children "just for a minute," or overestimate the trustworthiness and reliability of those to whom they may entrust their children. It is reasonably foreseeable that, because of such lapses, even the most attentive parent's young child will not always be prevented from going "in harm's way."

Our view is supported by the language of the ordinances (hereinafter ordinances) of the City and County of Honolulu and the County of Hawai'i recognizing the need for fences and other protective devices within and around private swimming pools to protect against injury to young children.[12] The ordinances, although enacted in only two

---

[12] The City and County of Honolulu (Honolulu County) has "found, declared and determined that the maintenance of swimming pools and other similar pools without precautionary measures constitutes a serious public hazard, particularly to children." Revised Ordinances of Honolulu (ROH), chapter 16, article 1, § 16–6.1 (1990). Honolulu County requires the owner of premises on which a swimming, dipping, or wading pool is located to completely surround either the pool or the

of four counties of the state, clearly indicate that the community in general recognizes the foreseeable danger,[13] and the need to protect against it.

Accordingly, we hold that a swimming pool manufacturer's duty to put a safe product on the market includes the duty to take such measures in manufacturing and marketing the pool as will reasonably protect against injury to young children arising from their use of the pool.

We are keenly aware that we should not impose a new duty upon members of our society without logical, sound,

---

property with a wall or a fence at least "four and one–half feet high" and "sufficient to make the pool inaccessible to small children[.]" *Id.* § 16–6.2(a). Additionally, all gates and doors must be self–closing and equipped with self–latching devices placed at least four feet above the ground or be otherwise inaccessible to small children. *Id.* § 16–6.2(b). In lieu of a fence or wall, the pool owner may provide a competent person to keep watch over the pool, or a pool cover or other protective device approved by the proper official "capable of preventing small children from falling into the water[.]" *Id.* § 16–6.2(c). The ordinance also provides that no new permits for such pools may be issued unless provision is made for such fence, wall, pool cover or other protective device. *Id.* § 16–6.3.

At the time of Wayne's death, the County of Hawai'i (Hawai'i County) characterized "unfenced man–made swimming pools" as an "attractive nuisance which may prove detrimental to children whether in a building, on the premises of a building, or upon an unoccupied lot." Hawai'i County Code, chapter 11, article 1, § 11–7(a)(28)(B) (1983).

Effective November 8, 1993, Hawai'i County enacted Ordinance No. 93–85 (No. 93–85), which adopted The 1991 Uniform Building Code (the Code). No. 93–85 adopts the language of both the ROH and the Code, particularly § 6309 of the Code, requiring protective devices for swimming, dipping and wading pools. *Id.* § 5–133.

[13] We note that Honolulu County and Hawai'i County have approximately 75.4% and 8.2% of the state's population, respectively. *The State of Hawaii [Hawai'i] Data Book, 1992.*

and compelling reasons, considering the social and human relationships of our society. *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 833 P.2d 70 (1992). Nevertheless, the same policy of assuring the safety and welfare of young children that motivated the two counties to adopt the ordinances compels us to impose a similar duty on pool manufacturers.

It may be argued, of course, that, since the ordinances' safety requirements apply only to the pool owner, the policy underlying the ordinances should not affect the manufacturer's duty. However, the policy of the ordinances to protect young children is based on the foreseeability of injury to them. We see no reason why that underlying foreseeability should not extend to the pool manufacturer and require the manufacturer to share in the responsibility of protecting against injury to young children. We do not believe that the pool manufacturer, having knowingly put the admittedly dangerous product on the market, should be allowed to rely on the obvious foreseeability of injury to young children to relieve itself of the responsibility to protect them from that injury. Stated otherwise, the manufacturer should not be allowed to put a product on the market which it admits is dangerous to young children without taking some reasonable measures to protect against foreseeable injury to them.

Nor do we think that imposing such a duty on the manufacturer is unreasonable. It will not add to the pool owner's total cost since, at least in Honolulu County and Hawai'i County, the pool owner must install such equipment anyway. Therefore, the manufacturer's sales will not be affected. Moreover, in accordance with the underlying policy of products liability law, the manufacturer is best able, through the purchase of liability insurance or

increased prices, to spread the costs of complying with the duty we now impose.

We reject Defendant's argument that the reasoning relied upon to support the duty we now impose on the swimming pool manufacturer would also require (1) cities to erect fences around all of their public streets, "since it is well known that young, unsupervised children sometimes dart onto the road and are injured"; and (2) the State to erect fences around beaches, "since unsupervised children can just as easily drown in the ocean as a pool." Suffice it to say that those questions are not before us. Moreover, the question is whether the imposition of the duty is reasonable in view of all the circumstances. *See Ontai.*

## VI. BREACH OF DUTY IN NEGLIGENCE

The issue of breach of duty is common to both negligent and strict products liability claims and is ordinarily one for the jury. *Brown.* However, as we have noted, the considerations for determining breach of duty in products liability cases differ between those two theories: in a negligence claim the plaintiff must prove the defendant's breach of duty of due care; however, under the doctrine of strict liability the plaintiff need only prove that the product was defective because it was unreasonably dangerous. As we have also indicated, under strict liability law, proof of a product's defectiveness is interlaced with proof of causation. Consequently, we will defer discussion of proof of the defectiveness of the pool until we discuss the question of causation in the following section of this opinion. In this section, we will discuss the issue of breach of duty under the principles of negligence outlined above.

The question, here, is whether Defendant carried its burden of showing from the evidence in the record that

no genuine issue of material fact existed as to whether it discharged its duty to guard against the foreseeable risk discussed above and that it was entitled to judgment as a matter of law, *see Beamer*, or that if the case went to trial Plaintiff could not prove Defendant's breach of duty. *First Hawaiian Bank*.

In light of the duty we have imposed on Defendant, Defendant was required to show from the evidence that there was no question that it had taken reasonable measures to protect against injury to young children. However, since Defendant claimed that it had no duty to warn or guard against such injury and that Plaintiff's negligence was the entire cause of Wayne's death, Defendant introduced no such evidence.

On the other hand, Patch's affidavit, introduced by Plaintiff, indicates that, although he did not request or purchase any safety devices from Defendant when he bought the pool, and Defendant did not send him such devices after that, he could not remember whether Defendant offered him such devices at the time of the purchase or advised him that they were available.

It is clear from the evidence, viewed in the light most favorable to Plaintiff, that Defendant failed to show the absence of a genuine issue of material fact as to whether Defendant offered Patch any safety materials or devices or informed him of their availability either at the time of or after the sale.

It will be up to the jury to decide from the evidence produced at trial what reasonable steps Defendant should have taken to guard against foreseeable injury to young children and whether Defendant was negligent in not taking those steps in this case. Based upon the evidence produced the jury may decide that the devices proposed by

Plaintiff would provide such reasonable protection, or it may decide that Defendant should have undertaken some other measure or measures that would provide reasonable protection against injury from the use of its product.

## VII. CAUSATION

We turn, now, to the question of whether the evidence and the reasonable inferences therefrom, viewed in the light most favorable to Plaintiff, show that no genuine issue of material fact exists as to whether the pool's design was a proximate cause of Wayne's death under negligence or strict liability law.

### A.

We first deal with Defendant's contentions regarding Plaintiff's burden of proof.

Defendant argues that Plaintiff was required, but failed to prove, (1) that the absence of safety devices enabled Wayne to enter the pool; or (2) that any of the safety devices would have prevented Wayne from entering the pool. The argument is without merit.

First, Plaintiff did not have the burden ascribed to her by Defendant. Defendant had the burden to show the absence of a genuine issue of fact on the question of causation. Second, circumstantial evidence is sufficient to prove causation in an action based on negligence, *see Kaeo v. Davis*, 68 Haw. 447, 719 P.2d 387 (1986), and/or strict liability. *Stewart v. Budget Rent-A-Car Corp.*, 52 Haw. 71, 470 P.2d 240 (1970).

In *Campbell*, the California Supreme Court outlined the basis for the use of circumstantial evidence to prove causation in products liability cases. In that case, the plaintiff claimed that she was injured because the manufacturer of the bus in which she was a passenger failed to

install a safety device that would have prevented her from falling when the bus made a sudden movement. At the conclusion of the plaintiff's case, the trial court granted the defendant's motion for a judgment of nonsuit based on the ground that the plaintiff had failed to prove that the bus was defective in design or that the alleged defect was a proximate cause of the plaintiff's injuries. The California Supreme Court reversed the trial court's decision, stating:

> Unless very unusual circumstances exist, [a claim that an injury was caused by a manufacturer's failure to provide a safety device] presents a factual issue which can only be resolved by the trier of fact. "In the ordinary case the question becomes one of what would have happened if [the product had been] otherwise. This is of course incapable of mathematical proof, and a certain element of guesswork is always involved. Proof of the relation of cause and effect can never be more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we have observed those sequences on previous occasions.' When a child is drowned in a swimming pool, no one can say with certainty that a lifeguard would have saved him; but the experience of the community is that with guards present people are commonly saved, and this affords a sufficient basis for the conclusion that it is more likely than not that the absence of the guard played a significant part in the drowning. Such questions are peculiarly for the jury. Whether proper construction of a building would have withstood an earthquake, whether reasonable police precautions would have prevented a

boy from shooting the plaintiff in the eye with an airgun, whether a broken flange would have made an electric car leave the rails in the absence of excessive speed, whether a collision would have occurred if the defendant had not partially obstructed the highway, and many similar questions, cannot be decided as a matter of law." (Prosser, *Proximate Cause in California* (1950) 38 CAL. L. REV. 369, 382–383, fns. omitted, emphasis added).

The plaintiff in a strict liability action is not required to disprove every possible alternative explanation of the injury in order to have the case submitted to the jury. "It is not incumbent upon a plaintiff to show that an inference in his favor is the only one that may be reasonably drawn from the evidence; he need only show that the material fact to be proved may logically and reasonably be inferred from the circumstantial evidence. (***Estate of Rowley*** [1967] 257 Cal. App. 2d 324, 334–35, 65 Cal.Rptr. 139, and cases cited therein; Witkin, *Cal. Evidence* (2d ed.) [§ 133,] pp. 1050–1051.) . . . The mere fact that other inferences adverse to plaintiff might be drawn does not render the inference favorable to plaintiff too conjectural or speculative for consideration [by the jury]." (***Dimond v. Caterpillar Tractor Co.*** (1976) 65 Cal.App.3d 173, 182, 134 Cal.Rptr. 895; see also ***Blank v. Coffin*** (1942) 20 Cal.2d 457, 460–61, 126 P.2d 868 (opn. by Traynor, J.) ["If a jury can reasonably infer from these primary facts that the material fact exists, the party has introduced sufficient

evidence to entitle him to have the jury decide the issue."]; *Greco v. Bucciconi Engineering Company,* (W.D.Pa. 1967) 283 F.Supp. 978, 984, affd. (3d Cir. 1969) 407 F.2d 87; Witkin, *Cal. Evidence, supra,* § 1133, pp. 1050–51.)

It is particularly appropriate that the jury be allowed to determine the inference to be drawn when the evidence indicates that a safety device, designed to prevent the very injury that occurred, was not present. To take the case from the jury simply because the plaintiff could not prove to a certainty that the device would have prevented the accident would enable the manufacturer to prevail on the basis of its failure to provide the safeguard. See *Haft v. Lone Palm Hotel, supra,* 3 Cal.3d 756, 772, 91 Cal.Rptr. 745, 478 P.2d 465.)[5] Such a rule would provide a disincentive to improve the safety features of a product and thereby interfere with one of the major policy goals of strict liability. (See *Escola v. Coca Cola*

---

[5] In *Haft,* a father and son drowned in a hotel swimming pool. Contrary to statute, no lifeguard was on duty at the pool and no sign was posted advising guests of this fact. (*Haft, supra,* 3 Cal. 3d at pp. 762–763, 91 Cal. Rptr. 745, 478 P.2d 465.) Finding that "the evidentiary void in the instant action results primarily from defendants' failure to provide a lifeguard to observe occurrences within the pool area" (p. 771, 91 Cal. Rptr. 745, 478 P.2d 465), this court held that once the plaintiffs proved that the defendants were negligent in this regard, and that a competent lifeguard probably would have prevented the deaths, the burden of proof on the issue of causation shifted to the defendants (p. 772, 91 Cal. Rptr. 745, 478 P.2d 465). "To require plaintiffs to establish 'proximate causation' to a greater certainty than they have in the instant case, would permit defendants to gain the advantage of the lack of proof inherent in the lifeguardless situation which they have created. [Citations.]" *Ibid.*

***Bottling Co.***, (1944) 24 Cal.2d 453, 462, 150 P.2d 436 (conc. opn. of Traynor, J.).)

***Campbell***, 32 Cal. 3d at 120–21, 184 Cal. Rptr. at 895–96, 649 P.2d at 228–29 (footnote in original).

Our review of the evidence indicates that Defendant's own proof provides circumstantial evidence of causation.

In her deposition, Penn testified, in pertinent part, as follows:

> A.  . . . I came down the steps and Wayne was out the — okay, there's steps that come down from David's room to the porch that is the then entrance to the living room. [sic] I came down the steps, and Wayne Robert was down there, and he said to me, "Can I go swimming?"
>
> And I turned to him, and in my most school-teachery voice I said to him, "You are not allowed near that pool without a grown–up."
>
> And then he turned and shouted, "Kelly, Kelly," and went around the other side of the porch[.]
>
> Q.  Then what happened next?
>
> A.  I went into the room and started sewing. Kelly then maybe approximately five minutes later came into the room. [sic] I turned from my sewing and I looked her in the eyes and I said, "Kelly, is it all right for Wayne to be out there by himself?" And Kelly said, "Yes."
>
> Q.  And then what happened?
>
> A.  I turned back to my sewing.
>
> Q.  And then what happened?
>
> A.  Kelly was drawing out of a book. She was doing some drawing on the sofa, and I was sewing. And then in about ten minutes I didn't hear Wayne

Robert. I didn't hear anything, so I got up to see where he was.

Q. And then what happened?

A. He was lying in the swimming pool.

Kelly's deposition contained the following pertinent testimony:

A. I finished my picture, then got up to go show Linda. And then I looked out the sliding doors, and then I saw my brother in the pool floating.

Q. He was entirely in the pool?

A. (Witness nods head up and down.) Yes, he was.

Q. Was he floating in the pool or was he submerged?

A. He was floating in the pool.

Additionally, the evidence shows that two days before Wayne drowned, he had been swimming in the pool under Plaintiff's supervision and with the aid of a flotation device.

The evidence in the record clearly supports a reasonable inference that, after being denied permission to go swimming again on February 8, 1988, a single–minded and unsuspecting Wayne went out to the pool and either fell or jumped in. The question of whether a safety device installed in or around the pool would have prevented Wayne from entering the pool is a genuine issue of material fact that must be determined by the fact finder.

## B.

We also find no merit in Defendant's argument that Plaintiff's negligence was the sole legal cause of Wayne's

death. There is clearly a genuine dispute over whether Plaintiff left Wayne in the care of Penn or Kelly. In either event, a fact finder could find that Plaintiff was not negligent in doing so. Moreover, even if a fact finder should find Plaintiff negligent, it could also find from the evidence that her negligence was not the sole cause of Wayne's death but was only one of the factors contributing to it, along with the negligence of all the defendants. In such case, Plaintiff's recovery on her negligent products liability claim would only be defeated completely if the fact finder found that her negligence was greater than the negligence of the defendants in this case. HRS § 663–31 (1985). On the other hand, her recovery, if any, on her strict liability claim would only be reduced by the fact finder's assessment of the extent to which her negligence contributed to Wayne's death. *Armstrong v. Cione*, 69 Haw. 176, 738 P.2d 79 (1987). At this juncture, it cannot be said as a matter of law that Plaintiff's negligence, if any, was the sole legal cause of Wayne's death.

## C.

Similarly, the fact that Patch did not install any safety devices in or around the pool, or, as Defendant argues, that pool owners in general may not wish to install the kind of safety devices proposed by Plaintiff because such equipment may be inconvenient to themselves or their neighbors, does not as a matter of law relieve Defendant of liability in this case, since a third party's negligence is not a defense unless such negligence is the sole proximate cause of the plaintiff's injuries. *Ontai*, 66 Haw. at 249, 659 P.2d at 743. That is a fact question which only the trier of fact can answer.

## VIII. CONCLUSION

Having concluded that genuine issues of material fact exist, we vacate the Judgment and remand this matter to the circuit court for further proceedings consistent with this opinion.

*Phillip L. Carey* (*William J. Rosdil* with him on the briefs) for plaintiff–appellant.

*Willson C. Moore, Jr.* (*Bruce H. Wakuzawa* with him on the brief; Rush Moore Craven Sutton Morry & Beh, of counsel) for defendant–appellee.